COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Fitzpatrick, Judges Benton, Elder, Bumgardner, Frank, Humphreys,
             Clements, Felton, Kelsey and Haley
Argued at Richmond, Virginia


JANICE LARUE ORNDORFF

                                                    OPINION BY
v.       Record No. 1325-02-4         CHIEF JUDGE JOHANNA L. FITZPATRICK
                                                    JUNE 14, 2005
COMMONWEALTH OF VIRGINIA

                       UPON REHEARING EN BANC

            FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
                          LeRoy F. Millette, Jr., Judge

            William B. Moffitt; Henry W. Asbill, *pro hac vice* (Cozen
            O'Connor, on brief), for appellant.

            Eugene Murphy, Assistant Attorney General (Jerry W. Kilgore,
            Attorney General; Judith W. Jadgmann, Attorney General; Margaret
            Reed, Assistant Attorney General, on briefs), for appellee.


        This matter comes before the Court on a rehearing en banc from a divided panel opinion

rendered November 23, 2004.  In that opinion, a panel of this Court considered Janice Larue

Orndorff's (appellant) appeal of the trial court's decision to deny her motion for a new trial

following her convictions for second-degree murder pursuant to Code § 18.2-32 and the use of a

firearm in the commission of murder pursuant to Code § 18.2-53.1.  Appellant contends evidence

was discovered after the jury returned its verdict that established she suffered from Dissociative

Identity Disorder (DID) (formerly known as multiple personality disorder or MPD), that such a

disorder constitutes a legal defense to murder, and that she was, therefore, entitled to a new trial.

The panel agreed and reversed the trial court's denial of her motion for a new trial, vacated her

convictions for second-degree murder and use of a firearm in the commission of murder, and

remanded for a new trial.

By order dated December 28, 2004, we granted the Commonwealth's petition for a rehearing en banc, stayed the mandate of the panel decision, and reinstated the appeal. Upon rehearing en banc, we affirm the trial court's denial of appellant's motion for a new trial and affirm her convictions.[1]

In accord with familiar principles of appellate review, we will view the evidence, and all reasonable inferences flowing from the evidence, in a light most favorable to the Commonwealth as the prevailing party in the trial court. Banks v. Commonwealth, 41 Va. App. 539, 543, 586 S.E.2d 876, 877 (2003).

## I. Background

The evidence established that, in early 2000, appellant and her husband were having severe marital problems. She believed that he was having an affair. She told her mother-in-law that she would "see him dead before he [left her] for another woman." She then contacted Thomas George Underwood (Underwood), a lawyer, and requested him to represent her "if it came to divorce." He declined to do so and offered to refer her to another lawyer. Underwood spoke to appellant again on March 20, 2000, the day of the murder, to inform her that the divorce lawyer he contacted could not see her for several days. Appellant "sounded fine" and said she was going to dinner with her husband for their anniversary. That same day, appellant's husband told his mother that "things are worse, I've had all I can take, I'm leaving [appellant] tonight."

---

[1] Appellant contends we lack jurisdiction to hear the case en banc because we failed to order the en banc rehearing within twenty days of the panel decision as required by Rule 5A:34. We disagree. Rule 5A:34 provides that "[a] rehearing en banc on motion of the Court of Appeals shall be ordered no later than 20 days after the date of rendition of the order to be reheard." By its plain terms, Rule 5A:34 applies only when a rehearing en banc is scheduled by the Court *on its own motion*. Here, the Court did not order a rehearing en banc on its own motion; rather, the Commonwealth petitioned for the rehearing. Thus, the time limit prescribed by Rule 5A:34 does not apply.

After returning home from dinner, appellant shot and killed her husband. He was shot five times: once in the top of his head, three times in his torso, and once in his left palm. He was found dead on the kitchen floor with a baseball bat in his left hand and a knife in his right hand.

At 8:37 p.m., appellant called Underwood and told him that she shot her husband because he attacked her with a baseball bat and knife. Underwood advised her to call 911 immediately and request an ambulance. A few minutes later, appellant called 911 and told the operator that her husband attacked her with a baseball bat and knife and that she had shot him. The 911 call was tape recorded and entered into evidence at trial.

During the phone call to 911, appellant's actions fluctuated among periods of lucidity, hysteria, disorientation, and childishness. At times, she spoke calmly and slowly and called the operator by name. At other times, she seemed unable to discern to whom she was speaking. She requested to speak to her "mommy," and at one point appeared to be speaking to her mother directly. She also cried hysterically and stated, "He is going to kill me." When the operator asked her location in the house, appellant replied that she was unsure where she was. Later, she told the operator that she was in the study. The operator also asked her where her husband was located, and appellant replied that he was on the kitchen floor. Later, she claimed that she did not know where he was. The operator asked appellant whether she had called Underwood before she called 911.[2] Appellant denied making the call. At times, she failed to answer the operator's questions.

While appellant was on the phone with the 911 operator, police officers gathered outside her house. First Sergeant Robert J. McHale (McHale) tried to coax appellant out of the house. She approached the front door and then returned to the residence. Eventually, appellant "bolted out of the residence." McHale ran to meet her and led her to his police cruiser. McHale stated

---

[2] Underwood also called 911 to ensure an ambulance was sent to appellant's residence.

that appellant continuously yelled and screamed that her husband was trying to kill her as she came out of the house. McHale, after detecting a "strong odor of alcohol," asked her whether she had been drinking. Appellant "very calmly" replied that she drank a "couple of glasses of wine" with dinner, but "then went back into he's trying to kill me." McHale said he found the sudden changes in appellant's demeanor—from hysterical to calm and back to hysterical again—"kind of strange." Other witnesses on the scene—including Underwood, Bo Longston, a paramedic, and appellant's son, Kurt Bond—reported that appellant was "not making any sense" and exhibited signs of disorientation and hysteria.

Before trial, defense counsel gave notice that appellant intended to present psychiatric and psychological evidence to rebut the anticipated position of the Commonwealth that her behavior the night of the murder was an act designed to deceive the police. Defense counsel conceded that they were not raising a psychiatric defense. "We are not claiming . . . that she did not understand right from wrong, nor are we contending that she suffered from an irresistible impulse." The Commonwealth moved to exclude the proffered evidence.

At the pretrial hearing on the Commonwealth's motion to exclude this testimony, mental health experts retained by defense counsel testified about appellant's mental state. Dr. Susan Fiester and Dr. Wilfred van Gorp diagnosed appellant as suffering from mental disorders, including post-traumatic stress disorder (PTSD) and dissociative disorder not otherwise specified (DD NOS). Dr. Fiester testified that DD NOS is the diagnosis indicated when the patient's symptoms meet "many of the criteria of one or the other specific dissociative disorders, but doesn't fit it exactly." Dr. Fiester and Dr. van Gorp based the diagnosis of DD NOS, in part, on appellant's inability to remember the events surrounding her husband's death, on her behavior during the 911 call, on transcripts of her interviews with police, on a review of her prior history

revealing that she had experienced a dissociative event after a car accident, and on lengthy personal interviews.

Neither Dr. Fiester nor Dr. van Gorp opined that appellant suffered from DID or any other mental disorder that would be a legal defense to the charged offenses. Dr. Fiester stated that she found no basis to conclude that appellant "was legally insane at the time of the offense." There was no evidence that she did not "know the difference between right and wrong" nor was she impelled to act by an "irresistible impulse." The trial court granted the Commonwealth's motion to exclude in part. The trial court allowed appellant's experts to explain, in general terms, the nature of dissociative amnesia, but they were not allowed to testify specifically about appellant's diagnosis.

At trial, the Commonwealth argued to the jury that appellant's post-shooting demeanor was a ruse designed "to conceal her guilt" and that appellant planted the baseball bat and knife after her husband had died. The Commonwealth buttressed their contention that appellant planted the baseball bat and knife with the testimony of Dr. Carolyn Revercomb, the medical examiner who conducted the autopsy on appellant's husband, and First Sergeant Robert C. Zinn, a blood stain analysis expert.

Dr. Revercomb testified that the gunshot wound to the top of the husband's head would have caused "[i]mmediate unconsciousness" and that it was not "likely that one would be able to hold onto any items such as bat or knife, having sustained such a wound." She further testified that the gunshot wound to the husband's left hand was "consistent with someone putting their hand out in [a defensive] posture" and that it was "very unlikely" that he "could hold a baseball bat with [his] hand in such a position." Furthermore, she opined that the gunshot wound to the left side of the husband's torso was consistent with his "being on the ground when it was inflicted."

Sergeant Zinn testified that, based on his examination and analysis of the medical examiner's autopsy report and photographs, police photographs of the crime scene, the husband's clothing, and the baseball bat, the husband could not have been holding the bat at the time he was shot.[3]

Dr. William Brownlee, an expert in the field of forensic medicine, testified for appellant and countered the Commonwealth's theory that she doctored the crime scene. Dr. Brownlee opined that, because the bat held by the husband was small, it could have been "easily gripped in the fingers" despite the bullet wound to the palm of his hand. Moreover, Dr. Brownlee testified that it was physiologically possible for the husband to continue holding the bat after the gunshot to the head.

Defense counsel argued that appellant shot her husband "because she was afraid . . . he was going to hurt her" and that her unusual demeanor and behavior after the shooting was not an attempt to conceal her guilt but rather occurred because she suffered from PTSD and was dissociating as a result of the trauma she had just experienced. Appellant did not pursue an insanity defense.

The jury found her guilty of second-degree murder and use of a firearm during the commission of murder.

Shortly after the jury read its verdict in the guilt phase of the trial, appellant engaged in unusual behavior at the jail. She apparently told jail personnel that she was only twelve years old

---

[3] Other evidence presented to the jury included the testimony of appellant's mother-in-law, appellant's son Kurt Bond, and appellant's friend Maura Jill Workman (Workman). Appellant's mother-in-law said that appellant told her she would rather see the husband "dead before he [left appellant] for another woman." When told by her mother-in-law not to "talk like that," appellant replied, "I can't help it, he's my whole life and that's what I live for." Kurt Bond said that, although his stepfather would get angry about "trivial things" and threaten to hit him, he was never hit by him and he never saw him hit appellant. Workman said that appellant offered her $10,000 to testify that she had seen appellant's husband physically abuse appellant. Workman stated that she had never seen such abuse and that she rejected appellant's offer.

and did not belong in the "strict school" because she had done nothing wrong. Her actions instigated further mental health evaluations.

After examining her, Dr. Fiester informed the court that appellant was unaware that she was an adult or where she was. "Her understanding of the situation," Dr. Fiester testified, "was that she's in dire fear because she's a child and she's done something wrong and she has no idea what it is and why she's where she is." When asked whether appellant's condition could "raise the spectrum of other psychiatric illnesses" besides a dissociative episode, Dr. Fiester replied that it could, explaining:

> It could raise the question of whether she might have problems with her reality testing; whether there is a psychotic part of the picture; whether there is what's called a dissociative identity disorder, which is what used to be known in the past as a multiple personality disorder; or some other type of a dissociative disorder.

Dr. Fiester opined that appellant had a "severe mental illness" that rendered her incompetent to assist counsel in her defense.

Immediately upon learning of appellant's behavior at the jail, Dr. van Gorp wrote in a letter to defense counsel as follows:

> This abrupt change in [appellant's] mental status is a very serious matter. It is my firm opinion that this decline and abrupt change in her mental state represents a state of regression and dissociation, producing a fugue-like state in which she has regressed to the identity she had as a child. At the very least, this represents dramatic regression in a person who has seriously dissociated: that is, in lay terms, she has become overwhelmed by the stress of her circumstances, and cannot consciously process what has happened to her. As a response, she has "split off" from her conscious experience, and regressed to a child-like state, now believing she is in school in Union City, Tennessee, where she apparently grew up. This altered identity also raises the possibility of an even more serious condition, in which dissociation is more pervasive, and a multiple personality disorder must be seriously considered and psychologically and psychiatrically ruled out.

Based on these evaluations, the trial court ruled that appellant was not competent at that time to be sentenced and ordered her committed to Central State Hospital for a mental health evaluation pursuant to Code §§ 19.2-169.1 and 19.2-176.[4]

Appellant remained at Central State Hospital for eight months. Dr. Greg Wolber, chief of the forensic evaluation team at Central State Hospital, and Dr. Daniel Sheneman, a member of the evaluation team, diagnosed her as having PTSD and bipolar disorder. Some members of the treatment team thought she was malingering and questioned whether she was really dissociating at all. They opined that "a lot of her behavior was strictly manipulative and controlling . . . and did not give credence to a true dissociative identity."

While appellant was at Central State, Dr. Wolber consulted on his own initiative Dr. Paul Frederick Dell, a clinical psychologist and an authority on dissociative disorders. Dr. Dell diagnosed appellant with DID. After consulting with Dr. Dell, Dr. Fiester and Dr. van Gorp revised their diagnosis and concurred that appellant suffered from DID. After consideration of all the evaluations, the trial court certified pursuant to Code §§ 19.2-169.1 and 19.2-176 that appellant was competent to be sentenced.

As a result of the new diagnosis of DID offered by Dr. Dell, Dr. Fiester, and Dr. van Gorp, defense counsel filed a motion for a new trial prior to the commencement of the sentencing phase. Defense counsel asked that the judge defer his ruling on the motion until evidence of the new diagnosis was presented to the jury during the sentencing phase as mitigating evidence. Defense counsel noted that the same evidence presented in mitigation

---

[4] Code § 19.2-169.1 authorizes the trial court, at any time "before the end of trial," to commit the defendant for a competency evaluation if "there is probable cause to believe that the defendant . . . lacks substantial capacity to understand the proceedings against him or to assist his attorney in his own defense." The trial court is directed to determine the defendant's competency after receiving a competency report from the evaluating physicians. Code § 19.2-176 authorizes the trial court, at any time after conviction but before sentencing, to commit the defendant for a mental health evaluation if the judge "finds reasonable ground to question [the defendant's] mental state."

would be used to support the motion for a new trial. The trial judge agreed to the defense request and postponed his ruling until the trial was completed.

At sentencing, the jury received psychological as well as extensive factual information about appellant's new diagnosis. Appellant's experts testified that the appropriate diagnosis for her mental state was DID. Dr. Dell based his diagnosis, in part, on his observation of classic DID symptoms, including the presence of alter personality states, unexplained periods of amnesia, and episodes of deafness. Regarding alter personality states, Dr. Dell stated he had "a very clear cut encounter with three different alter personalities": "Jacob," a strong, forceful male identified as the "protector" personality; "Jean Bugineau," a French speaking personality; and "Janice Nanney," a twelve-year-old child. Dr. Dell noted that appellant's "switches into a child state" were shown in the 911 call he had reviewed earlier. Dr. Dell also noted that, "in most any sphere of the records that you look," examples of appellant's amnesia could be found. The same could be said of examples of appellant's deafness, which Dr. Dell described as a "not uncommon dissociative sematic symptom[]." Moreover, based on his examinations of appellant, the results of his own testing, and the results of certain tests given to appellant by Dr. van Gorp, Dr. Dell did not believe appellant was malingering or faking her symptoms.

In summarizing why appellant had not been diagnosed with DID before trial, Dr. Dell cited the other experts' "profound lack of education and failure to ask questions and inability to recognize diagnostic signs." He noted that reaching a correct diagnosis of DID is partly "a function of whether . . . the clinician [] has the eyes to see" the alter personalities.

After consultation with Dr. Dell, Dr. Fiester and Dr. van Gorp revised their diagnosis and determined that appellant met the diagnostic criteria for DID delineated in the Diagnostic and Statistical Manual for Mental Disorders (4th ed. 1994) (DSM-IV). According to Dr. van Gorp, the four diagnostic criteria of DID are:

(A) the presence of two or more distinct identities or personality [states], each with its own relatively enduring pattern of perceiving[,] relating to and thinking about the environment [and] self; (B) at least two of these identities or personality states recurrently take control of the person's behavior; (C) inability to recall important personal information that is too extensive to be explained by ordinary forgetfulness; and ([D]) the disturbance is not due to the direct physiological effects of a substance, for example, blackouts or chaotic behavior during alcohol intoxication, or a general medical condition, for example, complex seizures.

Dr. van Gorp stated he first considered the possibility of appellant having DID only when he "heard more episodes of the child persona coming forth" after her conviction. He noted that DID is "a very uncommon condition" and "is not a disorder that most clinical psychologists or psychiatrists encounter that often and so . . . the psychologist or psychiatrist often tends to know what category the person falls into, such as dissociation, but unless what are called alters, these various personalities, emerge, the diagnosis can't be reached." He minimized the importance of appellant's apparent personality switches during the 911 call, stating that evidence of DID was not "manifested in the 911 tape except [for appellant's] calling the operator 'mommy,'" which, in retrospect, he considered "sort of a harbinger" or "a little tip of the iceberg" of "what later appeared to be the child personality of a twelve-year-old." Dr. van Gorp also stated that, based on the results of testing designed to detect malingering, appellant was not feigning her psychiatric symptoms of DID. Dr. Fiester's conclusions mirrored those of Dr. van Gorp and Dr. Dell.

Dr. Richard Joseph Loewenstein, a psychiatrist and authority in the fields of trauma disorders and dissociative disorders retained by defense counsel, also evaluated appellant and diagnosed her with DID. He examined appellant on March 3, 2002 and encountered three distinct personalities: the "Janice persona," which was the "usual baseline state"; a "childlike" alter personality; and an aggressive, self-proclaimed "protector" alter personality that "refused to

give its name." Dr. Loewenstein ruled out any malingering by appellant despite his usual "high index of suspicion . . . especially in a forensic context."

Dr. Loewenstein confirmed that DID "is a disorder that . . . appear[s] to begin in childhood" and that most people with DID "report a history of significant childhood trauma." Appellant "reported a history with her own mother of significant physical punishment, whippings with a switch, being locked for long periods of time in a room where she was not allowed out."[5] Dr. Loewenstein also testified that appellant's sons, in discussing their mother's "prior history," reported "a large number of symptoms" on the part of their mother that were consistent with DID, including "chronic forgetfulness," "being found by her children in a kind of trance state," and being "very changeable in her behavior, at times being a very meek, church-going person . . . and other times swearing like a sailor."

Based on his evaluation of appellant, Dr. Loewenstein stated that it was his opinion that, "at the time of the murder," appellant was "overwhelmed by symptoms of" DID and that, therefore, "her mental state at the time of the act should lead to a finding of legal insanity by Virginia law under the 'irresistible impulse' test of the insanity statutes."

After defense counsel presented the testimony of Dr. Dell, Dr. Loewenstein, Dr. Fiester, and Dr. van Gorp to the jury as outlined above, the Commonwealth called Dr. Daniel Sheneman, "the attending psychiatrist for the behavioral unit" at Central State Hospital and a member of appellant's "treating team" at that facility, as a rebuttal witness. He stated that, "other than the Janice Orndorff [he] knew as an adult," appellant "presented herself" only "as a twelve-year-old[,] Janice Nanney," during her stay at the hospital. She did so "about eight times." Dr. Sheneman further testified, however, that appellant did "not meet the criteria" for

---

[5] In her initial interviews with Dr. Fiester and Dr. van Gorp before trial, appellant reported no such child abuse.

DID and that her symptoms could "all be explained by . . . other diagnoses" and were "related to her personality style."

Explaining why appellant did not "meet the . . . criteria for [DID] as outlined in the DSM-IV," Dr. Sheneman said, among other things, that "[t]he only alter . . . was the twelve-year-old and according to the diagnostic criteria, you have to have more than one, which we did not observe." On cross-examination, Dr. Sheneman conceded that he incorrectly stated that the diagnostic criteria in the DSM-IV requires the presence of "more than one" alter personality. However, he was not convinced that appellant's presentation as a twelve year old qualified as a "personality state" or "distinct identity." He also did not believe that appellant's "inability to recall important personal information" was "too extensive to be explained by ordinary forgetfulness" as required by the DSM-IV criteria. Dr. Sheneman further stated that the incident of child abuse appellant informed him about—where appellant's mother "placed [her] in a closet when she was child and there was a rat in the closet"—did not "qualif[y] as the type of [very severe sexual or physical] abuse you would see in most people with DID." Furthermore, Dr. Sheneman said that the DSM-IV "specifically states . . . that you have to be careful about diagnosing [DID] in patients that have forensic [criminal] issues that may use it for secondary gain."[6] Based on all the factors contained in the DSM-IV and their observations of appellant's behavior, Dr. Sheneman and "the other members of the treatment team[] did not feel that [appellant] met the criteria for that diagnosis" of DID.

The court also heard from Angela Valentine (Valentine), who was appellant's cellmate both before she was sent to Central State Hospital and after she returned. Valentine testified that appellant told her "she could act like she was twelve years old when she got good and ready . . . so she could, you know, beat the doctors at Central State."

---

[6] He defined "secondary gain" as a benefit accruing to the patient as a result of the diagnosis other than the benefit to be gained by treatment of the disorder.

- 12 -

After considering all the evidence, the jury sentenced appellant to thirty-two years in prison for the murder of her husband, a sentence far in excess of the statutory minimum. The jury also sentenced her to three years in prison for using a firearm in the commission of murder.

The trial judge also denied appellant's motion for a new trial. In reaching that decision, the trial judge found that, while appellant showed the purported after-discovered evidence was not merely cumulative, corroborative or collateral, she failed to show that she could not have obtained that evidence, which was in her control, for use at trial through reasonable due diligence. The trial judge also found that appellant failed to show that the purported after-discovered evidence should produce the opposite result in another trial, stating as follows:

> In part, I conclude that [such evidence] would not produce opposite results on the merits at another trial because the jury did, in fact, hear all this. They heard . . .[,] in essence, her entire position, that she had DID, that there were multiple personalities, in fact, . . . another personality is the one that committed the murder . . . .

The trial judge sentenced appellant, in accord with the jury's verdict, to a total sentence of thirty-five years.

## II. The Trial Court Did Not Err in Denying Appellant's Motion for a New Trial

The law governing review of motions for new trials is well settled.

> "[M]otions for new trials based on after-discovered evidence are addressed to the sound discretion of the trial judge, are not looked upon with favor, are considered with special care and caution, and are awarded with great reluctance." A party who seeks a new trial based upon after-discovered evidence "bears the burden to establish that the evidence (1) appears to have been discovered subsequent to the trial; (2) could not have been secured for use at the trial in the exercise of reasonable due diligence by the movant; (3) is not merely cumulative, corroborative or collateral; and (4) is material, and such as should produce opposite results on the merits at another trial."

- 13 -

Commonwealth v. Tweed, 264 Va. 524, 528-29, 570 S.E.2d 797, 800 (2002) (quoting Stockton v. Commonwealth, 227 Va. 124, 149, 314 S.E.2d 371, 387 (1984); Odum v. Commonwealth, 225 Va. 123, 130, 301 S.E.2d 145, 149 (1983)).

Appellant contends the trial court abused its discretion in denying her motion for a new trial. Specifically, appellant argues that the trial court incorrectly concluded: (1) that she could have secured evidence before trial that she suffered from DID through the exercise of reasonable due diligence, and (2) that the new DID diagnosis would not produce a different result upon retrial. We find no error in the trial court's ruling.

### A. The Trial Court Did Not Err in Finding Appellant Failed to Exercise Reasonable Due Diligence

The record in this case supports the trial court's finding that evidence of appellant's DID was discernible and available at the time of trial through the exercise of reasonable due diligence. Although appellant was unable to obtain an expert who diagnosed the specific type of dissociative disorder until later in the case, this does not mean that the evidence was unavailable at the time of trial. In effect, appellant asks us to allow a different post-trial diagnosis of a preexisting mental illness to require a new trial. This is a continuum that the law does not encourage.

The record is replete with examples of, and information about, appellant's dissociative conduct and the possibility that the purported correct diagnosis of DID could have been made before trial. At the pretrial hearing, appellant presented two mental health experts who gave detailed opinions concerning her mental health at the time of the shooting and thereafter.[7] First, Dr. Fiester testified that, based on her interviews with appellant, which lasted over sixteen hours, her review of appellant's records, and the 911 call, appellant met "many of the criteria of one or

_____

[7] They also testified after appellant's conviction and used the same background in their revised diagnosis.

- 14 -

the other specific dissociative disorders." Dr. Fiester discussed several of appellant's dissociative events, including the dissociation and amnesia she experienced after an automobile accident and the dissociative behavior evident during the 911 call. Based in part on appellant's significant amnesia regarding the events surrounding her husband's death, Dr. Fiester concluded that appellant "was in a dissociative episode for a period of time subsequent to her husband's death." Dr. Fiester specifically noted that "[o]ne can experience amnesia as a part of a dissociative disorder, sometimes referred to as *multiple personality disorder*." (Emphasis added).

Dr. van Gorp reported that, during his examination of appellant before trial, he witnessed "an episode of dissociation by [appellant] right in my office that very day when I interviewed her." Describing the incident of dissociation, Dr. van Gorp said that, when he asked appellant to describe instances where someone tried to hurt her, she repeatedly said "I don't hear the question" and covered her ears with her hands. After a few moments, appellant "lowered her hands and she said, 'Did you ask me something.'" Dr. van Gorp classified the incident as a "classic episode of dissociation." Dr. van Gorp also found the 911 phone call to be "very poignant and glaring" because "addressing the 911 operator as 'mommy' would be a classic dissociation." Although Dr. van Gorp did not state that the 911 call conclusively evidenced an alter personality, he stated that it was a "harbinger" and "a little tip of the iceberg" of the twelve year old alter. He stated that the alter did not clearly manifest itself in the tape "*except* [when appellant] call[ed] the operator 'mommy.'" (Emphasis added).

Testifying at sentencing, Dr. Dell and Dr. Loewenstein reported that appellant presented symptoms of DID before trial. Dr. Dell explained that the "911 tape was *a very clear example* of dissociative confusion, of *switches into a child state*[,]" because "[t]here were times during the phone call where she was talking with the 911 operator where she was calling for mommy,

- 15 -

quote, unquote." (Emphasis added). He also stated that "instances of dissociation, amnesia, switches to other personalities," and deafness were "to be found in most any sphere of the records that you look."

Dr. Loewenstein also stated that it was likely that appellant's DID manifested itself before trial. Interviews with appellant's sons confirmed his suspicion that she experienced symptoms of the disorder in the past. Appellant's sons

> purported a large number of symptoms that would be, actually, quite consistent with the dissociative [identity] disorder[,] including chronic forgetfulness to the point of forgetting a couple of times a week that she was cooking food at home and being found by her children in a kind of trance state and not remembering that she had started cooking food.

The sons reported further that her behavior changed unexpectedly; "at times [she was] a very meek, church-going person . . . and at other times swearing like a sailor." Her sons also said that she acted in child-like fashion at times, particularly around her daughters. None of this was "new" evidence but clearly existed *prior* to trial.

Additionally, all of the experts opined that DID is an illness that develops over a long period of time and has its etiology in childhood. Dr. Dell, in describing the failure of the other experts to properly diagnose appellant's true condition, listed a "profound lack of education and inability to recognize diagnostic signs" as the basis for any possible earlier misdiagnosis. He testified that it was clear from the transcript of the 911 call that appellant's "alters" were present at that time. Similarly, Dr. van Gorp found the 911 call to be a clear harbinger of appellant's illness and cited a lack of education and training as the main barrier to diagnosing appellant's DID.

Thus, even though appellant's symptoms became more pronounced and easier to categorize after her conviction, that fact does not mean that appellant's illness could not have been discovered through the exercise of reasonable due diligence and does not require that we

reach a result different from that of the trial court. The testimony from the doctors provides clear evidence that, if appellant does indeed suffer from DID, she exhibited the clinical symptoms of that disease (albeit in varied forms) necessary for a correct diagnosis before trial. Such symptoms either were present and unrecognized by appellant's experts as significant or could have been discovered by asking the right questions or interviewing the right people. In any event, the diagnosis of DID was really just a different diagnosis of a known condition. We decline to hold that affixing a new label to a known set of behavioral patterns constitutes newly discovered "evidence." To hold otherwise would leave the door open for a new trial with each new diagnosis and, thus, dispense with the finality that a trial on the merits requires.

While we have not earlier addressed this specific issue, two of our sister states have reached the same conclusion. In State v. Fosnow, 624 N.W.2d 883 (Wis. Ct. App. 2000), a prison psychiatrist diagnosed the defendant with DID after his conviction on several felonies. When he received the diagnosis, the defendant filed a motion to withdraw his pleas of no contest because the *new* diagnosis would show he was not criminally responsible for his acts. Id. at 885. He argued that the new diagnosis constituted newly discovered evidence that entitled him to withdraw his earlier no contest plea. Id. However, The Court of Appeals of Wisconsin noted that, as in the instant case, extensive psychiatric information about the defendant was available at the time of the plea and indicated dissociative personality features and other possible DID symptoms. Id. at 888. In other words, the main factors underlying the new diagnosis existed and were available at the time of defendant's initial mental examinations. Accordingly, the court held that the new diagnosis was merely the new appreciation of the importance of existing evidence. Id. at 887, 888. Because "[n]ewly discovered evidence . . . does not include 'the new appreciation of the importance of evidence previously known but not used,'" id. at 886 (quoting State v. Bembenek, 409 N.W.2d 432, 435 (Wis. Ct. App. 1987)), the court denied defendant's

motion for a new trial.  See also People v. McSwain, 676 N.W.2d 236, 253 (Mich. Ct. App. 2003) ("Failure to recognize a reasonably discoverable mental illness is not enough to require a grant of postjudgment relief."); State v. Williams, 631 N.W.2d 623, 627 (Wis. Ct. App. 2001) (noting that an expert's assessment of preexisting information represents a "new appreciation of the importance of evidence previously known but not used," not newly discovered evidence), overruled on other grounds by State v. Morford, 674 N.W.2d 349, 362 (Wis. 2004).

In Sellers v. State, 889 P.2d 895 (Okla. Crim. App. 1995), the appellant was convicted of three counts of murder.  Id. at 896.  In an application for post-conviction relief, appellant argued that he was diagnosed after conviction with Multiple Personality Disorder (MPD) and that this newly discovered evidence required a new trial.  Id. at 897.  The court held that, "[t]hough at that time MPD was perhaps a relatively new mental disease, this fact does not provide a sufficient explanation . . . for defense counsel's failure to explore it" before trial because it was a recognized diagnosis at the time of trial.  Id.  "Trial counsel could have, with due diligence, discovered evidence of [appellant's] . . . MPD prior to trial.  Accordingly it was not 'newly discovered' and would not warrant a new trial."  Id. at 897 n.11.

Guided by the holdings in Fosnow and Sellers, the high standard of scrutiny to be applied to motions for a new trial based on after-discovered evidence, the broad discretion afforded the trial judge, and the facts of this case viewed in the light most favorable to the Commonwealth, we hold that the record here clearly supports the trial court's determination that a diagnosis of DID could have been made before trial with the exercise of reasonable due diligence.  Because the record supports the trial court's ruling, we will not disturb it on appeal.

B.  The Trial Court Did Not Err in Finding Appellant Failed to Demonstrate the
Materiality of the DID Diagnosis

We also agree with the trial court that appellant failed to show the new diagnosis of DID would have produced an opposite result at a new trial because the jury heard the evidence during the sentencing phase and rejected it.

Pursuant to the law governing motions for a new trial, appellant must demonstrate that the evidence in question is "material, and such as should produce opposite results on the merits at another trial." Odum, 225 Va. at 130, 301 S.E.2d at 149.  It is not enough that the evidence in question *might* produce a different result.  Rather, "[b]efore setting aside a verdict, the trial court must have evidence before it to show in a clear and convincing manner 'as to leave no room for doubt' that the after-discovered evidence, if true[,] would produce a different result at another trial." Carter v. Commonwealth, 10 Va. App. 507, 513, 393 S.E.2d 639, 642 (1990) (quoting Powell v. Commonwealth, 133 Va. 741, 756, 112 S.E. 657, 661 (1922)).

The unique procedural posture of this case shows that appellant failed to carry her burden.  When defense counsel filed a motion requesting a new trial based on appellant's new diagnosis, he asked the trial court to defer ruling on the motion until after the jury could consider the information and recommended a sentence.  The evidence presented to the jury, as outlined above, was extensive.  Several psychologists and psychiatrists described in great detail the nature of DID, appellant's background, why her diagnosis was not made earlier, and that one of her "alters" was responsible for the murder of her husband.  Appellant's doctors opined that appellant was not feigning her illness.  Dr. Sheneman, on the other hand, testified he thought appellant's behavior could be motivated by "secondary gain" and that appellant did not meet the criteria for DID.  Angela Valentine, appellant's cellmate, testified that appellant stated she could manipulate her behavior at will.  Thus, evidence for and against the DID diagnosis, which was simply a new label affixed to earlier known behavior patterns, was presented to the jury during

- 19 -

the sentencing phase of the trial, and they found it unconvincing even as possible mitigation of punishment. In short, the jury discounted the new diagnosis of DID and sentenced her to far in excess of the minimum sentence for the offense. Therefore, the jury resolved the question of whether the additional evidence would produce a different result at a new trial.

We acknowledge that the "materiality" prong of the after-discovered evidence test asks whether the new evidence would produce a different verdict "at another trial." The test is framed in this manner because it is designed around the normal course of events and presumes that no jury has weighed or considered the proffered after-discovered evidence. However, the procedural course of this case, as dictated by the appellant's request to allow the evidence in the *same trial*, precludes the argument that the evidence should be heard by another jury in another trial. Appellant requested this procedure and should not now be heard to challenge it. Additionally, the materiality requirement assumes that the newly discovered evidence, is, in fact, discovered after trial and is unavailable for the initial fact finder to consider. We agree with the trial judge who succinctly stated that appellant failed to prove that the new evidence would produce a different verdict at another trial because the jury heard all of the evidence underlying her claim and discounted it. A new trial presenting the same evidence to a new jury would not produce a different result. See Odum, 225 Va. at 130, 301 S.E.2d at 149.

### III. The Trial Court Did Not Err in Ruling that Appellant's Experts Could Not Testify that Her Mental Illnesses Was the Basis for Inconsistencies in Her Behavior

Appellant next contends the trial court erred by failing to allow her experts to testify that her mental illness was a basis for several inconsistencies in her behavior, including the 911 call made on the night of the murder. We disagree.

"The admission of expert testimony is committed to the sound discretion of the trial judge, and we will reverse a trial court's decision only where that court has abused its discretion." Brown v. Corbin, 244 Va. 528, 531, 423 S.E.2d 176, 178 (1992). "It is well settled

- 20 -

that an expert may not express an opinion as to the veracity of any witness." Davison v. Commonwealth, 18 Va. App. 496, 504, 445 S.E.2d 683, 688 (1994) (internal quotations omitted). "An expert witness may not express an opinion as to the veracity of a witness because such testimony improperly invades the province of the jury to determine the reliability of the witness." Pritchett v. Commonwealth, 263 Va. 182, 187, 557 S.E.2d 205, 208 (2002).

The appellant proffered that her experts would give an explanation other than "intentional fabrication" for several of her actions subsequent to her husband's death. In effect, as the trial court found, appellant wished to put on expert testimony "that she [was] in a dissociative state and that she's suffering from amnesia and it is not because she's lying." Although the trial court allowed the experts to testify as to the general effect of trauma and that some lay observers might consider a dissociative act to be faking, he would not allow expert testimony which would comment on the credibility of the appellant's statements. See id. ("[A]n expert may testify to a witness's or defendant's mental disorder and the hypothetical effect of that disorder on a person in the witness's or defendant's situation, so long as the expert does not opine on the truth of the statement at issue."). This ruling was consistent with law and preserved the issue of the credibility of appellant's statements for the jury. We find no error in the trial court's ruling.

IV. The Trial Court Did Not Err in Finding Appellant Competent for Sentencing

Lastly, appellant contends that the trial court erred in sentencing her because she was incompetent. We disagree.

The party alleging incompetency has the burden to prove it by a preponderance of the evidence. See Code § 19.2-169(E). The United States Supreme Court has held that "the standard for competency to stand trial is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" Godinez v. Moran, 509 U.S.

389, 396 (1993) (quoting <u>Dusky v. United States</u>, 362 U.S. 402, 402 (1960)).  The trial court's

competency finding is a question of fact and is reviewed under a plainly wrong standard.  <u>See</u>

<u>Delp v. Commonwealth</u>, 172 Va. 564, 570-71, 200 S.E. 594, 596 (1939); <u>see also</u> <u>Naulty v.</u>

<u>Commonwealth</u>, 2 Va. App. 523, 524, 346 S.E.2d 540, 542 (1986).  The evidence, viewed in a

light most favorable to the Commonwealth, establishes that appellant was competent to be

sentenced.

Appellant was sent to Central State Hospital for a post-trial evaluation pursuant to Code

§§ 19.2-169.1 and 19.2-176.  Dr. Wolber and the Central State treatment team submitted a report

stating that appellant was competent to be sentenced.  Two of the doctors involved in the report

were called by defense counsel and questioned at length.  The doctors pointed out that the

dissociative episodes appellant demonstrated were generally quite brief, lasting from just five to

six minutes.  They also stated that appellant could be easily refocused and that she could avoid

dissociative episodes by not putting her head down.  The doctors also opined that a "lot of her

behavior was strictly manipulative and controlling" and that there was a volitional component to

her dissociative episodes.  Although appellant's experts put on evidence supporting a different

conclusion, the trial court was free to accept or reject their opinions in whole or in part.  <u>Miller v.</u>

<u>Cox</u>, 44 Va. App. 674, 680, 607 S.E.2d 126, 129 (2005).  Credible evidence supports the trial

court's finding of competency, and we will not disturb it on appeal.

IV.  Conclusion

We hold that the trial court did not abuse its discretion in denying appellant's motion for

a new trial because she failed to show that the new diagnosis of DID could not have been made

through the exercise of reasonable due diligence and because she failed to show that the new

diagnosis would have resulted in a different verdict.  We further hold that the trial court did not

err in prohibiting appellant's experts from testifying regarding the veracity of her statements and

in finding appellant competent for sentencing.  Accordingly, we affirm appellant's convictions

for second-degree murder and use of a firearm in the commission of murder.

<u>Affirmed.</u>

Clements, J., with whom Benton and Elder, JJ., join, dissenting.

For the reasons that follow, I would hold the trial court abused its discretion in denying appellant's motion for a new trial based on after-discovered evidence that the psychiatric disorder from which she suffered, namely, dissociative identity disorder, rendered her legally insane at the time of the killing. Specifically, I would hold the trial court erred in concluding that appellant could have secured that evidence for use at trial through the exercise of reasonable diligence and that the admission of that evidence at another trial would not produce an opposite result. Accordingly, I respectfully dissent from the majority's holdings to the contrary.

Our Supreme Court has consistently held that

> [m]otions for new trials based on after-discovered evidence are addressed to the sound discretion of the trial judge, are not looked upon with favor, are considered with special care and caution, and are awarded with great reluctance. The applicant bears the burden to establish that the evidence (1) appears to have been discovered subsequent to the trial; (2) could not have been secured for use at the trial in the exercise of reasonable diligence by the movant; (3) is not merely cumulative, corroborative or collateral; and (4) is material, and such as should produce opposite results on the merits at another trial.

Odum v. Commonwealth, 225 Va. 123, 130, 301 S.E.2d 145, 149 (1983) (citation omitted); see also Commonwealth v. Tweed, 264 Va. 524, 528-29, 570 S.E.2d 797, 800 (2002). "The burden is on the moving party to show that all four of these requirements have been met in order to justify a new trial." Johnson v. Commonwealth, 41 Va. App. 37, 43, 581 S.E.2d 880, 883 (2003). As the majority points out, only the second and fourth requirements are at issue in this appeal.

Because the granting of a motion for a new trial based on after-discovered evidence is addressed to the sound discretion of the trial court, the court's "decision will not be reversed except for an abuse of discretion." Carter v. Commonwealth, 10 Va. App. 507, 514, 393 S.E.2d 639, 643 (1990). A trial court may be found to have abused its discretion if the court uses "an

- 24 -

improper legal standard in exercising its discretionary function," Thomas v. Commonwealth, 263 Va. 216, 233, 559 S.E.2d 652, 661 (2002), or "makes factual findings that are plainly wrong or without evidence to support them," Congdon v. Congdon, 40 Va. App. 255, 262, 578 S.E.2d 833, 836 (2003).

## A.  Reasonable Diligence

As previously mentioned, a new trial will not be granted on the basis of after-discovered evidence "unless such evidence could not have been discovered by the exercise of reasonable diligence in time for use at the former trial[]."  McClung v. Folks, 126 Va. 259, 266, 101 S.E. 345, 347 (1919).  Thus, the party seeking a new trial on the ground of after-discovered evidence must submit evidence (1) showing "that [s]he used reasonable diligence to secure [the after-discovered] evidence before the earlier trial" and (2) "explaining why [s]he was prevented from securing it."  Fulcher v. Whitlow, 208 Va. 34, 38, 155 S.E.2d 362, 365 (1967).  "Reasonable diligence always depends upon the facts and circumstances of the case."  McClung, 126 Va. at 266, 101 S.E. at 347.

Here, the trial court determined that appellant failed to show that the evidence that she suffered from dissociative identity disorder at the time of the killing could not have been discovered for use at trial through the exercise of reasonable diligence.  The record, however, does not support that determination.  Indeed, the record reveals that appellant did everything that was reasonably possible prior to trial to discover grounds for entering a plea of not guilty by reason of insanity and that, despite those efforts, evidence supporting a diagnosis of dissociative identity disorder did not present itself to defense counsel or the psychiatrists and psychologists involved in appellant's treatment and evaluation until after the guilt phase of the trial had ended.

The undisputed evidence establishes that, well before trial, appellant's counsel retained Dr. Fiester, a forensic psychiatrist and authority on personality disorders, and Dr. van Gorp, a

clinical psychologist and neuropsychologist and an authority on malingering, to examine and evaluate appellant to determine if she had any psychiatric or psychological disorders that were relevant to her defense. Both doctors thoroughly examined and evaluated appellant and the materials related to the case, including the tape of appellant's 911 call. While both doctors diagnosed appellant as having a propensity to dissociate and opined that the amnesia she experienced regarding her husband's murder was the result of a dissociative episode caused by the trauma of her husband's death, neither doctor found any evidence that would support a diagnosis of dissociative identity disorder or any other mental illness that would permit the reasonable assertion of an insanity defense. Thus, despite the exercise of reasonable diligence, appellant was precluded from entering an insanity defense at trial.

As the evidence further establishes, it was not until appellant entered into a childlike state after the jury rendered its verdict that Drs. Fiester and van Gorp encountered evidence that indicated she might be suffering from dissociative identity disorder. Soon after observing appellant in that state, Dr. Fiester testified that appellant's condition raised the possibility that appellant could have dissociative identity disorder. Upon learning of the incident, Dr. van Gorp immediately wrote that "a multiple personality disorder must be seriously considered and psychologically and psychiatrically ruled out." Explaining why he had not considered the possibility of appellant having dissociative identity disorder before then, Dr. van Gorp testified that a diagnosis of dissociative identity disorder "can only be made when [the patient's] various alters, or separate personalities, emerge." Similarly, Dr. Fiester testified that dissociative identity disorder cannot be diagnosed "without the presence of a separate identity." Hence, Dr. Fiester explained, she did not have "enough information to . . . make the diagnosis" of dissociative identity disorder until appellant presented "as a twelve-year-old girl" after her conviction. Moreover, the evidence indicates that dissociative identity disorder is not easily diagnosed.

Dr. Dell, who consulted with the staff at Central State Hospital during appellant's treatment, testified that diagnosing dissociative identity disorder is difficult because the various alter personalities are "cautious, distrusting and hidden" and are not easily discernible, particularly to the untrained or inexperienced eye. Thus, the record contains uncontradicted explanations as to why the doctors earlier had not considered the possibility of appellant having dissociative identity disorder.

The evidence also shows that appellant did not have control over the timing of the emergence of her symptoms of dissociative identity disorder. Both Drs. Fiester and Loewenstein testified that people with dissociative identity disorder cannot control the switching that occurs between their alter personalities. Moreover, no psychologist or psychiatrist involved in appellant's treatment or evaluation found that she was malingering or otherwise had control over the emergence of her symptoms. In fact, Dr. van Gorp, an expert in the detection of malingering, testified that, based on the normal slow evolution of the presentation of appellant's symptoms and the results of specialized tests he gave her that were designed to detect malingering, he was "convinced" appellant was not feigning her psychiatric symptoms of dissociative identity disorder.

In relying on various "dissociative" episodes experienced by appellant before the trial as proof that appellant "exhibited the clinical symptoms of [dissociative identity disorder] necessary for a correct diagnosis before trial," the majority appears to ignore the manifest distinction between mere "dissociation" and the much more serious condition of "dissociative identity disorder." As Dr. Fiester testified, "dissociation," by itself, "simply means the person doesn't recall" because "[t]here's a disconnect between the emotions and actions and the conscious awareness of [those emotions and actions.]" This was the diagnosis the doctors made before the trial. Dissociative identity disorder, on the other hand, is, according to Dr. Fiester, a distinctive,

severe dissociative disorder that involves "the emergence of another part of the personality that seems like almost a different person."

The majority also relies on (1) Dr. Fiester's pretrial allusion to "multiple personality disorder" in a wide-ranging discussion of the "variety of conditions" that can "trigger amnesia," (2) Dr. Dell's claim that he was able after appellant's multiple personalities had already emerged to retrospectively discern evidence of appellant's alter personalities from the transcript of the 911 call, and (3) Dr. Loewenstein's statements that some aspects of appellant's reported behavioral history were consistent with a diagnosis of dissociative identity disorder as grounds for concluding that Drs. Fiester and van Gorp should have been able, prior to trial, to diagnose appellant as suffering from dissociative identity disorder. In doing so, however, the majority appears to inappropriately place the responsibility for exercising the requisite diligence under Odum's second requirement on Drs. Fiester and van Gorp, rather than on appellant and her trial counsel, and to inappropriately employ an extraordinary, rather than reasonable, standard of diligence. See Odum, 225 Va. at 130, 301 S.E.2d at 149 ("The applicant bears the burden to establish that the [after-discovered] evidence . . . could not have been secured for use at the trial in the exercise of *reasonable* diligence by the *movant* . . . ." (emphasis added)). It is uncontroverted that the two doctors hired by appellant's counsel to examine and evaluate appellant before the trial were both accomplished mental health professionals who were eminently suited for performing the task at hand. Indeed, Dr. Fiester was an authority on personality disorders and was, in fact, a member of the "work group" that prepared the DSM-IV "in the area of personality disorders specifically." It is also clear from the record that Dr. van Gorp's and Dr. Fiester's pretrial examinations and evaluations of appellant and the 911 call were thorough and extensive. Moreover, Drs. Dell and Loewenstein examined appellant and the

transcript of the 911 call after, and with knowledge of, the post-conviction emergence of appellant's alter personalities, a benefit Drs. Fiester and van Gorp did not have before trial.

Furthermore, the majority's reliance on the out-of-state decisions it cites is, in my opinion, misplaced. The Wisconsin cases cited by the majority, State v. Fosnow, 624 N.W.2d 883 (Wis. Ct. App. 2000), and State v. Williams, 631 N.W.2d 623 (Wis. Ct. App. 2001), overruled on other grounds by State v. Morford, 674 N.W.2d 349, 362 (Wis. 2004), are factually dissimilar from this case, and the Oklahoma and Michigan cases cited by the majority, Sellers v. State, 889 P.2d 895 (Okla. Crim. App. 1995), and People v. McSwain, 676 N.W.2d 236 (Mich. Ct. App. 2003), are likewise inapposite.

In Fosnow, where the defendant had a lengthy history of mental illness and it was known prior to his guilty plea that he heard "voices," had significant "memory lapses," suffered from "traumatic" childhood abuse, and had "imaginary friends" who made him "do bad things," the court concluded that "Fosnow and his trial counsel were aware of a possible [dissociative identity disorder] diagnosis from [one of the examining psychiatrist's] report and did not choose to obtain additional evaluations that might have supported it [prior to entry of the guilty plea]." 624 N.W.2d at 889-91. In Williams, the purported newly discovered evidence was "simply [the psychologist's] assessment of pre-existing information, the same information [previously reported and] utilized by [the physician who originally examined the petitioner]." 631 N.W.2d at 627. In each case, unlike in this case, the purported newly discovered evidence was "previously known but not used." Fosnow, 624 N.W.2d at 886. In other words, it was merely a reassessment of the same evidence that had been discovered earlier, which is not the case here.

In McSwain, where the defendant was diagnosed with having dissociative identity disorder more than eight years after her conviction, the court concluded that, while there was considerable evidence in the record regarding the defendant's "*current* mental condition," the

record failed to establish she suffered from dissociative identity disorder at the time of the offense or trial. 676 N.W.2d at 254-55. In Sellers, the defendant claimed in his application for post-conviction relief based on newly discovered evidence solely that his multiple personality disorder could not have been discovered prior to trial because the disorder was "greatly misunderstood and often misdiagnosed." 889 P.2d at 897. Summarily rejecting Sellers's claim without setting forth or addressing any evidence relative thereto, the court simply ruled that, while "perhaps a relatively new mental disease," multiple personality disorder was a "recognized illness which defense counsel could have investigated." Id. Neither of the issues upon which these cases turned is on point here.

Because the record conclusively demonstrates that appellant used reasonable diligence prior to trial in seeking evidence that could reasonably serve as a basis for an insanity plea and explains why, despite that reasonable diligence, she was prevented from securing such evidence until after her conviction, I would hold that the trial court abused its discretion in finding appellant failed to meet her burden of establishing that the evidence that she suffered from dissociative identity disorder "could not have been secured for use at the trial in the exercise of reasonable diligence by [her]." Odum, 225 Va. at 130, 301 S.E.2d at 149.

### B. Materiality and Effect at Another Trial of the After-Discovered Evidence

Pursuant to the fourth requirement for obtaining a new trial based on after-discovered evidence, the defendant must establish that such evidence "is material, and such as *should* produce opposite results on the merits at another trial." Id. (emphasis added). This "well-settled" standard has also been stated to require that the evidence be such that it "'*ought* to produce opposite results on the merits'" at another trial. Lewis v. Commonwealth, 209 Va. 602, 608-09, 166 S.E.2d 248, 253 (1969) (emphasis added) (quoting Reiber v. Duncan, 206 Va. 657, 663, 145 S.E.2d 157, 162 (1965)). It is not enough, therefore, for the defendant to simply show

- 30 -

that the evidence in question might produce an acquittal. Indeed, "[b]efore setting aside a verdict, the trial court must have evidence before it to show in a clear and convincing manner 'as to leave no room for doubt' that the after-discovered evidence, if true[,] would produce a different result at another trial." Carter, 10 Va. App. at 513, 393 S.E.2d at 642 (quoting Powell v. Commonwealth, 133 Va. 741, 756, 112 S.E. 657, 661 (1922)).[8]

Here, the trial judge, observing that the jury recommended a heavy sentence for appellant, concluded that the purported after-discovered evidence "would not produce opposite results on the merits at another trial" because the jury heard at the penalty phase the after-discovered evidence, including that appellant "had [dissociative identity disorder], that

---

[8] I cite to Carter because it is a prior opinion from this Court concerning after-discovered evidence. I note, however, that the efficacy of this quotation may be problematic when the issue does not involve perjury. This quotation in Carter is based upon the following language in Powell, which concerned new evidence being offered to establish perjury:

> The courts properly require that it shall be made to appear affirmatively that the new evidence tending to show the mistake or *the perjury*, beyond question exists and is not a mere matter of belief or opinion, before they will grant the relief in such cases. *Where the ground is perjury*, the old rule was that the witness must appear of record to have been convicted of the perjury or his death must have rendered conviction impossible, before it could be regarded as good ground for the new trial. The modern rule is not so strict. By the preponderance of authority it seems to be sufficient if the court has evidence before it which *establishes the existence of the evidence relied on to show the perjury or mistake, in such a clear and convincing manner as to leave no room for doubt as to the existence of the evidence so relied on*, and the court is satisfied that the evidence is not collusive, that it seems to be true, and ought, if true, to produce on another trial an opposite result on the merits.

133 Va. at 755-56, 112 S.E. at 661 (emphases added). In short, the Powell opinion concerns evidence to "show . . . perjury," and it uses the "clear and convincing" standard to refer "to the *existence* of the evidence" that is offered to support the request for a new trial. Id. at 756, 112 S.E. at 661 (emphasis added).

there were multiple personalities, [and that] . . . another personality is the one that committed the murder."

Initially, I would hold the trial court abused its discretion in relying on the jury's apparent rejection of appellant's mitigating evidence at sentencing as grounds for concluding that such evidence would not produce a different result at the guilt phase. The correct standard is not whether the jury that convicted the defendant without benefit of the after-discovered evidence would, after hearing the new evidence, recommend a lenient sentence, but, rather, whether the new evidence "is material, and such as should produce opposite results on the merits *at another trial*," with a new jury. Odum, 225 Va. at 130, 301 S.E.2d at 149 (emphasis added).

The circumstances of this case exemplify the underlying rationale and merits of that distinction. Before sentencing, the jury heard no evidence regarding appellant's psychological state at the time of the killing. Because the evidence that later supported a diagnosis of dissociative identity disorder had not been discovered, appellant's experts were limited during the guilt phase of the trial to providing a general discussion of the nature of dissociative amnesia as a possible explanation of appellant's unusual post-killing behavior. Rejecting that explanation and appellant's claim of self-defense in favor of the Commonwealth's argument that appellant's unusual post-killing behavior was an attempt to cover up a malicious killing, the jury convicted her of murder. After appellant's alter personalities emerged, she filed a motion requesting a new trial based on the after-discovered evidence. She asked that the trial court defer ruling on the motion for a new trial until after presentation of her evidence in mitigation of the offense since the same evidence would be used to support the motion. The trial judge agreed that his ruling on the motion should be deferred "until the trial is completed." Having previously found appellant to be a murderer and a liar, the jury, not unsurprisingly, found her belated mitigating evidence of

insanity unpersuasive.[9]  Indeed, the change in appellant's theory of defense might itself have

adversely affected the jury's perception of her character.  Regardless, the jury's sentencing

verdict clearly is not a reliable indicator of how a new, untarnished fact finder would view such

evidence "at another trial" where insanity was at issue in the guilt phase.  Id.

Evidence reasonably offered to support a defendant's claim that he or she was legally

insane at the time of the alleged offense has long been recognized in Virginia as being material

to the issue of the defendant's guilt.  See Boswell v. Commonwealth, 61 Va. (20 Gratt.) 860,

874-76 (1871) ("If [the defendant] relies on the defence of insanity, he must prove it to the

satisfaction of the jury.  If, upon the whole evidence, they believed he was insane when he

committed the act, they will acquit him on that ground."); Evans-Smith v. Commonwealth, 5

Va. App. 188, 196, 361 S.E.2d 436, 441 (1987) ("Evidence is material if it relates to a matter

properly at issue.").

> Virginia law recognizes two tests by which an accused can
> establish criminal insanity, the M'Naghten Rule and the irresistible
> impulse doctrine.  The irresistible impulse defense is available
> when "the accused's mind has become 'so impaired by disease that
> he is totally deprived of the mental power to control or restrain his
> act.'"

---

[9] The majority points out that the jury heard testimony during the sentencing phase of the trial from Dr. Sheneman that appellant did not meet the criteria for dissociative identity disorder and from appellant's cellmate that appellant said she could manipulate her apparent personalities at will.  However, the jury also heard Dr. Sheneman testify that he had only experienced one of appellant's alter personalities and had mistakenly believed that dissociative identity disorder required two alter personalities in addition to the host personality.  Dr. Sheneman also testified that neither he nor the other member of appellant's treatment team specialized in dissociative disorders and that they did not perform any psychological testing on appellant during her stay at Central State Hospital, relying instead on Dr. van Gorp's testing.  Moreover, the jury heard Dr. Fiester testify that she would not be surprised to learn that someone suffering from dissociative identity disorder had told others that she could manipulate her alter personalities, because people who have dissociative identity disorder are frightened by the effects of the disorder and, as a means of coping with their fear, want to believe they "have control over this process" when, in actuality, they do not.  Dr. Fiester further testified that some alter personalities, particularly the protective ones, feel they are in control even though, in actuality, they cannot "control switching."

Bennett v. Commonwealth, 29 Va. App. 261, 277, 511 S.E.2d 439, 446-47 (1999) (quoting

Godley v. Commonwealth, 2 Va. App. 249, 251, 343 S.E.2d 368, 370 (1986) (quoting Thompson

v. Commonwealth, 193 Va. 704, 716, 70 S.E.2d 284, 292 (1952))).

The after-discovered evidence in this case consists of substantive information, in the form

of expert-witness testimony and proffered evidence, indicating that appellant suffered from

dissociative identity disorder at the time of the shooting and that one or more of her alter

personalities, other than the host or baseline personality of Janice Orndorff, was responsible for

committing the charged offenses. The after-discovered evidence also indicates that appellant

was not malingering in her presentation of dissociative identity disorder symptoms, that she was

unable to control the switching between the alter personalities within her, that her alter

personalities recurrently took control of her behavior, and that her host personality of Janice had

no memory of her husband's murder. Dr. Loewenstein testified that one of appellant's protector

alter personalities admitted to killing appellant's husband to protect the host personality.

Dr. Loewenstein stated in his affidavit that, upon his forensic evaluation of appellant, he

concluded that, at the time of the killing, appellant "suffered from an impulse that was sudden,

spontaneous, and unpremeditated." Dr. Loewenstein further concluded that appellant was so

"overwhelmed" by symptoms of dissociative identity disorder and other less severe mental

disorders and "so impaired by these diseases of the mind[,] that she was deprived of the mental

power to control or restrain her acting to harm [her husband]." Dr. Loewenstein also concluded

that appellant was suffering from an irresistible impulse when she shot her husband and was,

thus, legally insane at the time of the killing.

Although it is within the province of the fact finder to decide whether appellant's mind

was ""''so impaired by disease that [she was] totally deprived of the mental power to control or

restrain"''' herself from acting at the time of the offenses, if true, Dr. Loewenstein's testimony

- 34 -

and affidavit, in combination with the other after-discovered evidence presented in this case, present a viable defense of legal insanity under the doctrine of irresistible impulse. Bennett, 29 Va. App. at 277, 511 S.E.2d at 447 (quoting Godley, 2 Va. App. at 251, 343 S.E.2d at 370 (quoting Thompson, 193 Va. at 716, 70 S.E.2d at 292)). I would hold, therefore, that the after-discovered evidence is material to the issue of appellant's guilt and is sufficient to "show in a clear and convincing manner 'as to leave no room for doubt' that the after-discovered evidence, if true[,] would produce a different result at another trial." Carter, 10 Va. App. at 513, 393 S.E.2d at 642 (quoting Powell, 133 Va. at 756, 112 S.E. at 661).

The Commonwealth argues that, as a matter of law, the after-discovered evidence does not provide a valid defense of legal insanity under the irresistible impulse doctrine because "the evidence overwhelmingly established that subsequent to the alleged irresistible impulse the defendant doctored the scene of the crime . . . and called her attorney for assistance." I disagree.

While it is true, generally, that, as logic dictates, "the lack of restraint inherent in an impulsive act is inconsistent with a contemporaneous concealment of the impulsive act," Vann v. Commonwealth, 35 Va. App. 304, 314, 544 S.E.2d 879, 883 (2001), here, given the volatile, "switching" nature of appellant's mental disorder, the fact that appellant called her attorney and "doctored the scene of the crime" after the shooting does not mean that she was not acting pursuant to an irresistible impulse when she shot her husband. As previously noted, people with dissociative identity disorder cannot restrain their alter personalities from recurrently taking and relinquishing control of their behavior. The shifts between and among the alter personalities can occur very quickly. Furthermore, as Dr. Loewenstein testified, the switching by the alter personalities tends to increase when the host personality is frightened.

Thus, the record supports the finding that, as the Commonwealth appears to concede, the phone call to appellant's attorney and any manipulation of the crime scene by appellant occurred

"subsequent to the . . . irresistible impulse" that resulted in the killing. That is to say, after killing appellant's husband, appellant's alter personalities relinquished control of her behavior, leaving her "behind to attempt to deal with what happened." The post-shooting phone call and any manipulation of the scene do not change the fact that, having had her behavior taken over by one or more of her protector alter personalities at the time of the shooting, appellant herself was not responsible for shooting her husband. Hence, as a matter of logic, Vann would not apply.

The record also supports the converse finding that, as Drs. Loewenstein's and Dell's testimony appears to suggest, appellant's alter personalities continued to control her behavior following the shooting. According to Dr. Loewenstein, one of appellant's protector alter personalities stated that he directed appellant to call her attorney after the shooting. Dr. Dell testified that appellant was still being controlled by her alter personalities well after the shooting during the 911 call. Clearly, appellant may not be held accountable under Vann for the phone call to her attorney and for doctoring the crime scene if, as during the shooting, her actions were still being controlled by her alter personalities at the time. Like the shooting itself, such actions would be the product of an irresistible impulse.

Thus, under either interpretation of the facts, the evidence of appellant's post-shooting phone call to her attorney and doctoring of the crime scene does not alter my conclusion that the after-discovered evidence provides appellant a valid defense of legal insanity under the irresistible impulse doctrine. To conclude otherwise would defy logic and elevate form over substance.

Hence, I would hold that appellant met her burden of establishing that the after-discovered evidence "is material, and such as should produce opposite results on the merits at another trial." Odum, 225 Va. at 130, 301 S.E.2d at 149.

C. Conclusion

Having concluded that appellant met the requirements necessary to obtain a new trial based on after-discovered evidence, I would hold the trial court abused its discretion in refusing to grant appellant a new trial. Accordingly, I would reverse the trial court's denial of the motion for a new trial, vacate appellant's convictions for murder in the second degree and use of a firearm in the commission of murder, and remand this case for retrial.[10]

---

[10] Because it is unlikely they would arise again on retrial in the same context, if at all, I find it unnecessary to address the other issues raised in this appeal.

Tuesday                                            28th

        December, 2004.


Janice Larue Orndorff,                                          Appellant,

  against          Record No. 1325-02-4
                   Circuit Court Nos. CR47787 and CR47788

Commonwealth of Virginia,                                       Appellee.


Upon a Petition for Rehearing En Banc

Before Chief Judge Fitzpatrick, Judges Benton, Elder, Annunziata, Bumgardner,
Frank, Humphreys, Clements, Felton and Kelsey


On December 7, 2004 came the appellee, by the Attorney General of Virginia, and filed a

petition praying that the Court set aside the judgment rendered herein on November 23, 2004, and grant

a rehearing *en banc* thereof.

On consideration whereof, the petition for rehearing *en banc* is granted, the mandate entered

herein on November 23, 2004 is stayed pending the decision of the Court *en banc*, and the appeal is

reinstated on the docket of this Court.

The parties shall file briefs in compliance with Rule 5A:35. The appellee shall attach as an

addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the

Court in this matter.  It is further ordered that the appellee shall file with the clerk of this Court twelve

additional copies of the appendix previously filed in this case.

A Copy,

                    Teste:
                                    Cynthia L. McCoy, Clerk

                    By:
                                    Deputy Clerk

Present:   Chief Judge Fitzpatrick, Judges Benton and Clements
Argued at Alexandria, Virginia


JANICE LARUE ORNDORFF

                                                    OPINION BY
v.        Record No. 1325-02-4        JUDGE JEAN HARRISON CLEMENTS
                                                  NOVEMBER 23, 2004
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
LeRoy F. Millette, Jr., Judge

William B. Moffitt; Henry W. Asbill, *pro hac vice* (Asbill Moffitt &
Boss, Chtd., on briefs), for appellant.

Eugene Murphy, Assistant Attorney General (Jerry W. Kilgore,
Attorney General; Margaret Reed, Assistant Attorney General, on
brief), for appellee.


Janice Larue Orndorff was convicted in a jury trial of murder in the second degree, in

violation of Code § 18.2-32, and use of a firearm in the commission of murder, in violation of

Code § 18.2-53.1.  On appeal, Orndorff contends the trial court erred in (1) denying her motion

for a new trial based on after-discovered evidence that she suffered from a psychiatric disorder

that rendered her legally insane at the time of the offenses, (2) limiting her opportunity to present

expert-witness testimony on her post-homicide conduct, and (3) proceeding to the sentencing

phase of the trial despite evidence showing she was incompetent to stand trial.  Finding the trial

court abused its discretion in not granting Orndorff a new trial based on after-discovered

evidence that, at the time of the killing, she suffered from an irresistible impulse resulting from

dissociative identity disorder, formerly known as multiple personality disorder, we reverse the

trial court's denial of the motion for a new trial, vacate the convictions, and remand for a new

trial. Because it is unlikely they will arise again on retrial in the same context, if at all, our decision makes it unnecessary to address the other issues raised in this appeal.

## I. BACKGROUND

"Under familiar principles of appellate review, we view the evidence and all reasonable inferences fairly deducible from that evidence in the light most favorable to the Commonwealth, the party that prevailed below." Banks v. Commonwealth, 41 Va. App. 539, 543, 586 S.E.2d 876, 877 (2003).

Orndorff was indicted by a Prince William County grand jury for the first-degree murder of her husband, Goering Orndorff, in violation of Code § 18.2-32, and the use of a firearm during the commission of murder, in violation of Code § 18.2-53.1.

Pretrial, defense counsel notified the Commonwealth that Orndorff intended "to introduce psychiatric and psychological evidence concerning [her] amnesia" to rebut the Commonwealth's anticipated position that Orndorff's post-shooting demeanor and conduct on the night of the homicide was an act intended to deceive both the investigators of the alleged crime and the jury. Such evidence, defense counsel stated, was not intended for the purpose of raising a psychiatric defense. "We are not claiming," defense counsel continued, "that she did not understand right from wrong, nor are we contending that she suffered from an irresistible impulse." The Commonwealth moved to exclude Orndorff's psychiatric and psychological evidence.

At a pretrial hearing on the Commonwealth's motion, Drs. Susan J. Fiester and Wilfred G. van Gorp, mental-health experts retained by defense counsel to perform psychiatric and psychological evaluations of Orndorff to determine if she had any psychiatric or psychological disorders relevant to the charged offenses, opined, based on their separate examinations of Orndorff and materials related to this case, including the tape of Orndorff's call

to 911, that Orndorff had a propensity to dissociate her emotions and actions from her conscious awareness and experienced, among other mental-health-related conditions, a "dissociative state" subsequent to and precipitated by the trauma of her husband's death. That dissociative state, the doctors further testified, caused her inability to recall her prior actions that evening, including the shooting. Dr. van Gorp, a clinical psychologist and neuropsychologist, testified that

> a person who is experiencing a dissociative episode in the moment will get somewhat confused. They will be regressed, and regressed is a term of art meaning somewhat immature or infantile in their presentation, and they may or may not have some recall of events that happened five minutes ago, but they will be overall confused. So they will come across as a confused person, and may be inconsistent in their recall.

Dr. Fiester, a forensic psychiatrist, testified that "[d]issociation doesn't mean the person's not capable of directed action. It simply means the person doesn't recall. There's a disconnect between the emotions and actions and the conscious awareness of [those emotions and actions.]" Neither expert diagnosed Orndorff as suffering from dissociative identity disorder or any other mental disorder that rose to the level of a stand-alone defense to the criminal charges brought against her. Dr. Fiester testified that she found "no evidence that [Orndorff] was legally insane at the time of the offense," including no evidence of either irresistible impulse or Orndorff's inability to "know the difference between right and wrong" at the time of the killing. The trial court ruled that the doctors would be permitted to explain generally at trial the nature of dissociative amnesia but not to testify that they had actually examined or diagnosed Orndorff.

During the guilt phase of the jury trial, the following evidence was presented: Orndorff married her husband in 1993. In early 2000, the marriage began to unravel. At that time, Orndorff began calling her mother-in-law "a couple of times a week complaining about [Orndorff's husband]." Orndorff told her mother-in-law that "she thought he had a girlfriend, thought he was running around with a woman." During one of their conversations, Orndorff told

her mother-in-law she knew he was "out with that woman again" and she would "see him dead before he [left her] for another woman." Orndorff's mother-in-law did not take Orndorff's statement seriously, believing instead that Orndorff was simply trying to "scare him into not leaving her." When told by her mother-in-law not to "talk like that," Orndorff replied, "I can't help it, he's my whole life and that's what I live for." Orndorff "consistently told [her mother-in-law] that she loved Goering" and "Goering told [his mother] he loved [Orndorff], too."

During that same time period, Orndorff contacted Thomas George Underwood, a friend and local attorney who was representing her concerning a "property related problem" and who had previously represented her husband in traffic and financial matters. Orndorff asked Underwood if he could represent her "if it came to divorce." Orndorff "reported to [Underwood] that Goering had started drinking again and she was concerned about his activities," including his going away for a weekend without telling her where he was going. She was also concerned "for the safety of [her] boys," who were living with them. According to Underwood, Orndorff was "so concerned" about how her husband's activities "would affect her," she had Underwood prepare a will for her on March 1, 2004, leaving everything to her three children. He suggested she hire a private detective if she was concerned about her husband having an affair. However, believing his "representation of [Orndorff's husband] was close enough that [he] shouldn't get involved in [the divorce]," Underwood told Orndorff he could not represent her in the divorce action but could refer her to a divorce lawyer.

During the afternoon of March 20, 2000, Underwood called Orndorff and told her the divorce lawyer to whom he had referred her could not see her "for a week or ten days." Orndorff told Underwood that "would be all right" because her pregnant daughter was "scheduled to be induced" in two days and she was going to be in Baltimore, Maryland for the birth. Orndorff

told the lawyer that "she was going out for dinner for her anniversary with Goering" that night. According to Underwood, Orndorff was not upset or angry at the time and "sounded fine."

That same day, Orndorff's mother-in-law called Orndorff's husband at work and asked how he and Orndorff were doing, because she "knew they had been having problems." Orndorff's husband responded, "[M]om, . . . things are worse, I've had all I can take, I'm leaving tonight."

Testifying on his mother's behalf, Judd Lee Bond, Orndorff's teenage son who lived with Orndorff and her husband at their house in Manassas, Virginia, stated that, later that evening, he heard his mother and stepfather return home after going out for their anniversary dinner. When they entered the house, Judd Bond heard his stepfather yelling and angrily "stomping around." Frightened and unable to "stand it anymore," he left and went to a friend's house.

Judd Bond also testified that, in January 2000, his stepfather had begun to drink alcohol after abstaining from doing so for many years. Judd Bond also testified that his stepfather was "becoming more violent" and that he and his brother "were terrified of him." Recounting an episode in which, during a physical confrontation, his stepfather had threatened to kill him, Judd Bond testified that, sometime between January 2000 and March 2000, he had removed the bullets from his stepfather's automatic pistol because he "was afraid to have a loaded gun in the house that he owned."

At 8:37 p.m. on March 20, 2000, Orndorff called Underwood. She reported that she had shot her husband, saying he had come at her with a knife and a baseball bat. She said her husband was still alive and asked the lawyer to come to the house. When he asked her if she had called for an ambulance, she said she had not. He told her to call for one right away. The call lasted "[l]ess than a minute." Because Orndorff sounded "hysterical" and "appeared to be upset," Underwood called 911 to make sure an ambulance was sent to the house.

- 5 -

After talking to Underwood, Orndorff called 911 at 8:39 p.m. She told the 911 operator her husband had come after her with a baseball bat and a knife and she had shot him. She also told the operator she was afraid to come out of hiding in the house because her husband was still alive, had gained possession of the gun, and was trying to kill her. At numerous points during the call, Orndorff cried hysterically without responding to the operator's questions and repeatedly and rapidly asked for help, stating, "He is going to kill me." At other times during the call, she spoke slowly and more calmly, telling the operator that "he" took her knife and a baseball bat and was going to kill her and that she did not know whether she was sitting down but she could feel the carpet with her hands and her legs. Several times during the call, she asked for her mother and appeared to be speaking directly to her mother on one occasion. On several occasions, she appeared not to know with whom she was speaking. Other times, she called the operator by name. At times, she spoke loudly; other times, she whispered and said she could not talk because "he" would hear her. Asked by the operator whether she had called Underwood earlier, Orndorff said she knew Underwood but had not called him. Asked by the operator where in the house Orndorff's husband was, Orndorff initially indicated he was on the "kitchen floor" and later said she did not know where he was. Asked where in the house she was, Orndorff indicated it was dark and said she did not know where she was. Later, she indicated she was in the study and that she could hear the front door being opened. After further discussion about her fear of being killed by her husband, Orndorff indicated she had started to go to the front door but then returned to her hiding place. At approximately 9:25 p.m., Orndorff went to the front door and exited the house. First Sergeant Robert J. McHale, who had been waiting behind his cruiser on the road in front of the house, ran to her and led her up the street to a police cruiser.

The 911 operator who handled Orndorff's call, Constance Palmore, testified that, while she was on the phone with Orndorff, she "had no reason to doubt [Orndorff's] claims of being afraid." She further testified that Orndorff's call was unlike any other call she had received in her fifteen years of taking calls for the police department because Orndorff could not "pinpoint where she was in her own home." She also found it "a little odd" that Orndorff had called Underwood before calling 911.

First Sergeant McHale testified that, before Orndorff came out of the house through the front door, another police officer had approached the house and opened the front door. McHale further testified that, approximately a minute before Orndorff eventually came out of the house, he saw her approach the open front door with a cordless telephone in her hand. McHale motioned with his hands for her to come out. Rather than leaving the house, however, Orndorff turned around and disappeared from McHale's sight. McHale further testified that, the next time Orndorff approached the front door, she "bolted out of the residence." According to McHale, when he met her and guided her away from the house, Orndorff was "screaming" that her husband was going to kill her. She was "hysterical" and "continued," McHale testified, "to yell and scream." However, McHale further testified, when, after noticing a "strong odor of alcohol" coming from her, he asked if she had been drinking that night, she "very calmly" stated that she had had a "couple of glasses of wine" with dinner and "then went back into he's trying to kill me." McHale testified he found the sudden changes in Orndorff's demeanor—from hysterical to calm and back to hysterical again—"kind of strange."

After talking to Orndorff and calling 911, Underwood went to Orndorff's house, arriving "shortly after 9:00 p.m." He saw "police officers all over the place." When he first saw Orndorff, she was "on the floor of the back seat" in a police car that had been driven partway down the street away from the house. Underwood observed that she was "crying" and "shaking

and whimpering." She was unresponsive when he spoke to her. After Orndorff received medical treatment from a paramedic at the scene, Underwood observed that "[s]he was still hysterical and not making sense." According to Underwood, Orndorff was still in that condition when he left shortly after 11:00 p.m.

Bo Longston, the paramedic who rendered medical treatment to Orndorff that night, testified Orndorff was "freaking out" at the time. He also testified she was "agitated" and "visibly upset." "She was," Longston testified, "scared like you would see on TV, as opposed to what I've seen in the past."

Testifying on his mother's behalf, Kurt Bond, Orndorff's other teenage son who lived with Orndorff and her husband, stated that, when he first saw his mother that night upon returning home from a meeting, she was in the back of a police car in "a fetal position, crying and shaking." He further testified that, when the police allowed him to join his mother in the police car, she did not initially recognize him and was "hysterical, just crying and not making any sense, screaming, 'Help me. Help me. He's going to hurt me. He's going to hurt me.'" Kurt Bond noticed that his mother had bruises on "the inside of her thigh" and "on [her] left arm." He further testified that, when one of the detectives told Orndorff later that night that her husband was dead, she "broke down again" and "accuse[d] the police of killing him."

Kurt Bond also testified that, when he left the house shortly after 7:00 p.m. on March 20, 2000, to attend a meeting, he observed that the telephone book on the table near the kitchen was open, although he did not know to which page. He further testified that, between January 2000 and March 2000, he was "frightened" of his stepfather because he had started drinking and would get angry about "trivial things" and "threaten to hit" him. According to Kurt Bond, however, his stepfather never hit him and he never saw him hit Orndorff.

- 8 -

After Orndorff left the house, the police unsuccessfully attempted "to establish contact with anybody that may have been in the residence at that point." Concerned that "somebody may have . . . a weapon inside," the police "deploy[ed] gas into the residence." After allowing time for the gas to take effect, the police SWAT team entered the house around 1:00 a.m. Inside, they found Orndorff's husband dead, lying on the kitchen floor with a baseball bat in his left hand. He had been shot five times, once in his left palm, thrice in his torso, and once in the top of his head. The police also observed a handgun on the table in the kitchen and a telephone book on a nearby table open to the page that included Underwood's telephone number. Later, after lifting the body, the police discovered a knife in the decedent's right hand. The police also subsequently recovered Orndorff's will "torn in half in the family room."

Dr. Carolyn Revercomb, the medical examiner who conducted the autopsy on the decedent, testified that the wound to the top of his head would have caused "[i]mmediate unconsciousness" and that it was not "likely that one would be able to hold onto any items such as a bat or knife, having sustained such a wound." Dr. Revercomb further testified that the gunshot wound to the decedent's left hand was "consistent with someone putting their hand out in [a defensive] posture" and that it was "very unlikely" that he "could hold a baseball bat with [his] hand in such a position." Dr. Revercomb also testified that the gunshot wound to the left side of the decedent's torso was consistent with his "being on the ground when it was inflicted."

First Sergeant Robert C. Zinn, a blood-stain-analysis expert with the Prince William County Police Department, testified that, based on his examination and analysis of the medical examiner's autopsy report and photographs, the police's photographs of the crime scene, the decedent's clothing, and the baseball bat, the decedent could not have been holding the bat at the time he was shot.

Testifying on behalf of Orndorff, Dr. William Brownlee, an expert in the field of forensic medicine, opined that, because the bat found in the decedent's left hand was small, it could "easily be gripped in the fingers," thus, exposing the palm of the hand to a bullet wound. Dr. Brownlee further testified that one holding a bat in such a manner would not necessarily drop the bat if a bullet entered the palm because the bullet would irritate the muscles in the forearm causing the fingers to go into spasm and strongly grasp the bat. Dr. Brownlee also opined that it was physiologically possible for the decedent to continue to grasp the knife in his right hand despite being shot in the head and falling to the floor and that inserting the knife in his hand after he had been shot would have "left physical evidence of someone doing that on the floor."

The evidence also established that, during their marriage, Orndorff and her husband were motorcycle enthusiasts who participated in a number of "charity rides" sponsored by Payne's Biker Bar in Leesburg, Virginia. Maura Jill Workman, a former owner and manager of the bar, testified that she knew Orndorff and her husband from the "charity rides" and that both were friends of hers. She further testified that, in July 2000, Orndorff came to the bar, told Workman that she was facing life imprisonment, and offered to pay Workman $10,000 to testify that she had seen her husband physically abuse her. Workman testified that she had never seen such abuse and rejected the offer.

At one point in the trial, when the bat and knife were being displayed to the jury, Orndorff "became visibly upset." She began to shake and weep uncontrollably, fell to the floor, and said repeatedly, "[K]eep him away from me. He's going to kill me."

In closing argument to the jury, counsel for the Commonwealth argued, *inter alia*, that Orndorff's post-shooting demeanor was a ruse designed "to conceal her guilt." Defense counsel argued, *inter alia*, that Orndorff shot the decedent "because she was afraid . . . he was going to hurt her" and that Orndorff's unusual demeanor after the shooting was not an attempt to conceal

her guilt but occurred because she was dissociating as a result of the trauma she had just experienced. After deliberating, the jury found Orndorff guilty of second-degree murder and of using a firearm during that murder.

A few days later, as the penalty-determination phase of the trial was about to begin, defense counsel informed the court that it had been reported to them that, almost immediately after the conviction, Orndorff had engaged in unusual behavior at the jail. She had apparently told jail personnel that she was only twelve years old and did not belong in the "strict school" because she had done nothing wrong.

After examining Orndorff, Dr. Fiester testified that Orndorff was not aware that she was an adult or of where she was. "Her understanding of the situation," Dr. Fiester testified, "was that she's in dire fear because she's a child and she's done something wrong and she has no idea what it is and why she's where she is." When asked whether Orndorff's condition could "raise the spectrum of other psychiatric illnesses" besides a dissociative episode, Dr. Fiester replied that it could, explaining:

> It could raise the question of whether she might have problems with her reality testing; whether there is a psychotic part of the picture; whether there is what's called a dissociative identity disorder, which is what used to be known in the past as a multiple personality disorder; or some other type of a dissociative disorder.

Dr. Fiester opined that Orndorff had a "severe mental illness" that rendered her incompetent to assist counsel in her defense.

Immediately upon learning of Orndorff's behavior at the jail, Dr. van Gorp wrote in a letter to defense counsel as follows:

> This abrupt change in Ms. Orndorff's mental status is a very serious matter. It is my firm opinion that this decline and abrupt change in her mental state represents a state of regression and dissociation, producing a fugue-like state in which she has regressed to the identity she had as a child. At the very least, this represents dramatic regression in a person who has seriously

- 11 -

> dissociated: that is, in lay terms, she has become overwhelmed by the stress of her circumstances, and cannot consciously process what has happened to her. As a response, she has "split off" from her conscious experience, and regressed to a child-like state, now believing she is in school in Union City, Tennessee, where she apparently grew up. This altered identity also raises the possibility of an even more serious condition, in which dissociation is more pervasive, and a multiple personality disorder must be seriously considered and psychologically and psychiatrically ruled out.

The trial court found Orndorff to be incompetent to stand trial and ordered her committed to Central State Hospital for a mental health evaluation. Orndorff remained in treatment at Central State Hospital for eight months, at which point, the trial court agreed with the doctors at the hospital that Orndorff was competent to stand trial.

Prior to the recommencement of the trial, Orndorff filed a motion requesting a new trial due to after-discovered evidence. At the beginning of the penalty-determination phase of the trial, defense counsel asked that the trial court defer ruling on the motion for a new trial until after presentation of Orndorff's evidence in mitigation of the offense since the same evidence would be used to support the motion. The trial judge agreed that his ruling on the motion should be deferred "until the trial is completed."

After the Commonwealth represented that Orndorff had no criminal record, the following evidence was presented to the jury: Toward the end of Orndorff's stay at Central State Hospital, Dr. Greg Wolber, the Chief of the Forensic Evaluation Team at the hospital, consulted, on his own initiative, with Dr. Paul Frederick Dell, a clinical psychologist and an authority on dissociative disorders. Based on his examination of Orndorff, Dr. Dell diagnosed her as suffering from dissociative identity disorder. During subsequent examinations, Dr. Dell had "a very clear-cut encounter with three different alter personalities" of Orndorff. "The first," according to Dr. Dell, "was a personality named Jacob who is apparently male and who was very strong, forceful, given to speaking constantly with cuss words and who . . . [was] angry,

- 12 -

confronting, challenging, tough." According to Dr. Dell, Jacob was Orndorff's "angry protector," the alter personality that is usually "created in childhood" as a result of abuse and has "the job . . . of coming out and absorbing physical punishment that was more than the child could take." The second alter personality encountered by Dr. Dell was "a character named Jean Bugineau," who "insisted on speaking French." The third alter personality was "a part" named "Janice Nanney" who was "twelve-and-a-half years old."

Dr. Dell also testified that dissociative identity disorder is difficult to diagnose because the different alter personalities "do not generally go around advertising their presence. They are cautious, distrusting and hidden." Dr. Dell explained that, "if parts come out that do not say, hello, you know, I'm Fred, and instead just come out and talk and don't visibly appear to be particularly different from the host personality, you won't pick them out." Dr. Dell further explained that dissociative identity disorder "arises as a result of recurrent childhood trauma, usually at the hands of a parent, and what you're dealing with is the long-term aftereffect of child abuse." Thus, Dr. Dell continued,

> [b]y the time an individual shows up in therapy as an adult, we now have somebody who is in their 20s or 30s or 40s or 50s where the original multiplicity originated somewhere around the age of five, give or take a year or two, and this person has been functioning as a covert, hidden person with multiple personality disorder for decades, but parts are very used to being hidden.

Dr. Dell further testified that it was evident to him from the transcript of the tape of Orndorff's call to 911 on the night of the shooting that "switches" between Orndorff's alter personalities were "occurring during the conversation so that at times there is a child alter speaking to the 911 operator" and, "during much of the tape, [she] is not aware that her husband is dead" and has "no idea where she is." Dr. Dell also testified that, based on his examinations of Orndorff, the results of his own testing, and the results of certain tests given to Orndorff by Dr. van Gorp, he did not believe Orndorff was malingering or faking her symptoms.

- 13 -

After consultation with Dr. Dell, Drs. van Gorp and Fiester concurred in his diagnosis that Orndorff suffered from dissociative identity disorder.

Relying on the <u>Diagnostic and Statistical Manual for Mental Disorders</u> (4th ed. 1994) (DSM-IV), Dr. van Gorp testified that the four diagnostic criteria of dissociative identity disorder are:

> (A) the presence of two or more distinct identities or personality [states], each with its own relatively enduring pattern of perceiving[,] relating to and thinking about the environment [and] self; (B) at least two of these identities or personality states recurrently take control of the person's behavior; (C) inability to recall important personal information that is too extensive to be explained by ordinary forgetfulness; and ([D]) the disturbance is not due to the direct physiological effects of a substance, for example, blackouts or chaotic behavior during alcohol intoxication, or a general medical condition, for example, complex seizures.

Dr. van Gorp explained that, with dissociative identity disorder, "there is a host personality and this is usually the person who's been the lifelong person that most people know; but there are alternate personalities." The alter personalities, Dr. van Gorp further explained, are "walled off usually from the conscious experience of the host personality," but "[a]s the person becomes more and more stressed and symptomatic, . . . they can intrude [on the host personality] and the person will switch into another personality." Each of these alter personalities, Dr. van Gorp explained, "has his or her own basic memories and so forth."

Dr. van Gorp further testified that he first considered the possibility of Orndorff having dissociative identity disorder only when he "heard more episodes of the child persona coming forth" after her conviction. Dr. van Gorp explained that dissociative identity disorder is "a very uncommon condition" and "is not a disorder that most clinical psychologists or psychiatrists encounter that often and so . . . the psychologist or psychiatrist often tends to know what category the person falls into, such as dissociation, but unless what are called alters, these

various personalities, emerge, the diagnosis can't be reached." A diagnosis of dissociative identity disorder, Dr. van Gorp emphasized, "can only be made when these various alters, or separate personalities, emerge." Additionally, Dr. van Gorp testified, "it's very common for a person with dissociative identity disorder to not exhibit the complex of symptoms until you see the person over time and many contacts and the symptoms often evolve." Thus, Dr. van Gorp explained, while the tape of the 911 call clearly contained indications of dissociation, evidence of dissociative identity disorder was not "manifested in the 911 tape except [for Orndorff's] calling the operator 'mommy,'" which, in retrospect, was "sort of a harbinger" or "a little tip of the iceberg" of "what later appeared to be the child personality of a twelve-year-old." Dr. van Gorp, an authority in the field of malingering detection, also testified, that, based on the results of specialized tests designed to detect malingering and the slow evolution of the presentation of her symptoms, he was "convinced" Orndorff was not feigning her psychiatric symptoms of dissociative identity disorder.

Dr. Fiester, an authority on personality disorders, testified that she reached the diagnosis of dissociative identity disorder only after seeing Orndorff present "as a twelve-year-old girl" after her conviction and learning of the subsequent reemergence of the same alter personality "soon after that." Only then, Dr. Fiester testified, did she have "enough information to . . . make the diagnosis." Dissociative identity disorder, Dr. Fiester explained, cannot be diagnosed "without the presence of a separate identity." Dr. Fiester further testified that, in addition to Orndorff's "host state" and the twelve-year-old girl alter personality, at least two other alter personalities have since emerged, a "hostile" alter personality and a "French" alter personality.

Dr. Fiester also testified that are several types of dissociative disorders, each with its own "specific set[] of symptoms." One type, according to Dr. Fiester, are dissociative states, which are "limited" and occur simply when "[t]he person can dissociate, say, be driving . . . and end up

- 15 -

somewhere and have no idea how they got there." Dissociative identity disorder, on the other hand, Dr. Fiester testified, involves "the emergence of another part of the personality that seems like almost a different person." "[P]ersonality disorders," Dr. Fiester explained, unlike episodic mental illnesses such as "significant depression," are "ongoing, enduring" disorders that are "traits of the person, sort of characteristics of the person's style and functioning," and "are present over years, ever since adulthood."

Dr. Fiester further testified that she would not be surprised to learn that someone suffering from dissociative identity disorder told others that "she could make herself be twelve years old," because people who have dissociative identity disorder are frightened by the effects of the disorder and, as a means of coping with their fear, want to believe they "have control over this process" when, in actuality, they do not. Furthermore, Dr. Fiester testified, some alter personalities, particularly the protective ones, feel they are in control even though, in actuality, they cannot "control switching."

Dr. Richard Joseph Loewenstein, a psychiatrist and authority in the fields of trauma disorders and dissociative disorders, testified that he was retained by defense counsel to evaluate Orndorff and that, in performing a psychiatric examination of her on March 3, 2002, he encountered three distinct personalities within Orndorff: the "Janice persona," which was the "usual baseline state"; a "childlike" alter personality; and an aggressive, self-proclaimed "protector" alter personality that "refused to give its name." According to Dr. Loewenstein, the protector alter personality that refused to give its name called the Janice personality "The Kid" and the childlike alter personality "Squirt." The unnamed protector alter personality also referred to another alter personality named "Jean" as "Frenchman" or "Frog" and stated that there were other alter personalities but "the rules" prevented it from telling Dr. Loewenstein who they were. That reluctance to share information, Dr. Loewenstein testified, was "quite typical of

bona fide [dissociative identity disorder] individuals," as there are "often various kinds of codes of secrecy with the dissociative identity disorder individual." Dr. Loewenstein further testified that, based on his examination, he diagnosed Orndorff as suffering from dissociative identity disorder, among a number of other less severe psychiatric disorders. Dr. Loewenstein stated that, despite his usual "high index of suspicion for [malingering] especially in a forensic context," he was able to rule out any malingering by Orndorff.

Dr. Loewenstein also stated that people with dissociative identity disorder

> experience themselves . . . like a collection of people, sort of like the bleachers at [a baseball] [s]tadium where there are different people kind of jumping across each other, leaping out, grabbing the hot dog vendor, and so they may experience themselves as several entities at the same time who control each other or say things that another part of them experiences as they are saying it, but they have no control over it and then they feel that their thoughts are being withdrawn or that, in fact, their body is controlled by another entity.

The "shifts in personality," Dr. Loewenstein testified, can "range . . . from seconds occasionally to minutes." Dr. Loewenstein further explained that "research and clinical works suggest that it's unusual for full control to exist for long periods of time without at least other alter identities manifesting themselves indirectly through the one that is out."

Dr. Loewenstein further testified that people with dissociative identity disorder "are often very sensitive to violent situations, cues that will remind them of traumas that they have experienced" in the past. Thus, Dr. Loewenstein testified, "in frightening or violent or dangerous environments, they may begin to switch much more, . . . becom[ing] increasingly ill in the sense that they're switching uncontrollably or in ways that are very maladaptive for them."

Dr. Loewenstein further stated that dissociative identity disorder "is a disorder that . . . appear[s] to begin in childhood" and that most people with dissociative identity disorder "report a history of significant childhood trauma." Orndorff, Dr. Loewenstein testified, "reported a

history with her own mother of significant physical punishment, whippings with a switch, being locked for long periods of time in a room where she was not allowed out." Dr. Loewenstein also testified that, in discussing their mother's "prior history," Orndorff's sons reported "a large number of symptoms" on the part of their mother that were consistent with dissociative identity disorder, including "chronic forgetfulness," "being found by her children in a kind of trance state," and being "very changeable in her behavior, at times being a very meek, church-going person . . . and other times swearing like a sailor."

Dr. Loewenstein further testified on cross-examination that, although the Janice personality had no memory of the shooting, the protector alter personality that would not identify itself appeared to have "a very clear recollection at least of its own of what happened that night" and "described in detail the shooting episode as a narrative event." According to Dr. Loewenstein, the unnamed protector alter personality told him that

> there was a terrible fight that was going on between her and her deceased husband; that he was drunk; that he was confronting her. . . .
> . . . "The Kid" was attempting to fight back. She never fought back. She poured beer on him but she didn't throw the beer bottle. . . . [T]he Frenchman, Jean, . . . and [the unnamed protector alter personality] both fought back against the husband; . . . they found a gun that had been hidden behind a bread box in the kitchen . . . [by] the Defendant. . . .
> . . . [The unnamed protector alter personality] and Jean were standing between the deceased husband and the Defendant; . . . the Defendant was being "protected by them"; . . . [the unnamed protector alter personality] and Jean shot the husband; . . . Janice came back and told the husband to stop; . . . he kicked her.
> Then the personality Jean and [the unnamed protector alter personality] continued to shoot the husband and . . . he continued to come after her with his knife and later with a baseball bat despite having been shot repeatedly and . . . he still lay on the floor bleeding for some time and then . . . [the unnamed protector alter personality] and Jean left and left "The Kid" behind to attempt to deal with what happened[;] . . . "The Kid" still didn't know her husband was dead.

Dr. Loewenstein further testified that the unnamed protector alter personality also told him that

> [the unnamed protector alter personality] shot [the husband] in the hand; that despite that he was able to clutch his knife; that he switched the knife from hand to hand and later on picked up the baseball bat and . . . was threatening to kill her still, even though he was bleeding and[;] . . . that she had not altered the position of the body.

Dr. Loewenstein also testified that the Janice personality did not tell him about calling her attorney after the shooting but told him that, because "she was anticipating some kind of trouble," she opened the telephone book before she and her husband went out for their anniversary dinner, pointed Underwood's number out to her sons, and told them to call him if there were any problems. According to Dr. Loewenstein, the unnamed protector alter personality told him that, after the shooting, "the Janice personality was confused about what happened," so the unnamed protector alter personality "pointed out the number in the book, indicated it for her to look at," and told her to call her lawyer, who then told her to call 911.

Testifying as a rebuttal witness for the Commonwealth, Dr. Daniel Sheneman, "the attending psychiatrist for the behavioral unit" at Central State Hospital and a member of Orndorff's "treating team" at that facility, stated that, "other than the Janice Orndorff [he] knew as an adult," Orndorff "presented herself" only "as a twelve-year-old; Janice Nanney" during her stay at the hospital. She did so, Dr. Sheneman testified, "about eight times." Dr. Sheneman further testified, however, that Orndorff did "not meet the criteria" for dissociative identity disorder and that her symptoms could "all be explained by . . . other diagnoses" and were "related to her personality style." Explaining why Orndorff did not "meet the . . . criteria for dissociative identity disorder as outlined in the DSM-IV," Dr. Sheneman stated that "[t]he only alter . . . was the twelve-year-old and according to the diagnostic criteria, you have to have more

- 19 -

than one, which we did not observe." However, during cross-examination, Dr. Sheneman responded to defense counsel's questioning as follows:

> [DEFENSE COUNSEL]: Now, you suggested that the DSM criteria for dissociative identity disorder required three personalities?
>
> [WITNESS]: I said more than one. I think you have to have two or more.
>
> [DEFENSE COUNSEL]: Well, Ms. Orndorff as Ms. Orndorff is one personality; is she not?
>
> [WITNESS]: Yes.
>
> [DEFENSE COUNSEL]: And Ms. Orndorff as a twelve-year-old is another distinct personality; is it not?
>
> [WITNESS]: If you are under the opinion that that is an alter; yes.
>
> [DEFENSE COUNSEL]: So, it only requires one alter, am I right? That's what the diagnosis requires, not two?
>
> [WITNESS]: Two or more distinct identities. So, I guess technically that is correct.
>
> [DEFENSE COUNSEL]: So, if you said that it required more than one alter, you would be wrong, am I right?
>
> [WITNESS]: It requires two or more personalities.
>
> [DEFENSE COUNSEL]: If you said it required two alters, you would be wrong, right?
>
> [WITNESS]: I guess that is correct.

Dr. Sheneman further testified on cross-examination that he was not convinced that Orndorff's presentation as a twelve year old was a "personality state" or "distinct identity" and that he did not believe that Orndorff's "inability to recall important personal information" was "too extensive to be explained by ordinary forgetfulness." Dr. Sheneman also testified that neither he nor the other member of Orndorff's treatment team specialized in dissociative

- 20 -

disorders and that they did not perform any psychological testing on Orndorff during her stay at Central State Hospital, relying instead on Dr. van Gorp's testing. Dr. Sheneman further stated that Orndorff told him about an incident during her childhood in which her mother "placed [her] in a closet when she was child and there was a rat in the closet." Such conduct, Dr. Sheneman opined, constituted "significant" child abuse but did not "qualif[y] as the type of [very severe sexual or physical] abuse you would see in most people with [dissociative identity disorder]."

Angela Marie Valentine, who shared a cell with Orndorff at the Prince William Detention Center before Orndorff was sent to Central State Hospital and after Orndorff returned from the hospital, also testified as a witness for the Commonwealth. She testified that Orndorff told her that "at any God given time she could be five or twelve, whenever she wanted to be, and she was going to beat the[] doctors at Central State." Valentine further testified that, while she never heard Orndorff "talk like a twelve-year-old," she did see "her act like she [did not] know what was going on and then a few seconds later she was back to herself." According to Valentine, Orndorff would "be hysterical one minute and then all of sudden" she would "c[o]me right back to her senses." Valentine also recounted a time when, to Valentine's surprise, Orndorff "changed up on her," meaning that "all of a sudden," Orndorff became "aggressive and angry" and "was uttering expletives," which Valentine had never seen her do before.

After argument by counsel, the jury fixed Orndorff's punishment at thirty-two years for the second-degree-murder conviction and three years for the use-of-a-firearm conviction.

Soon thereafter, Orndorff refiled her motion for a new trial on the basis of after-discovered evidence of a mental illness that would sustain an insanity defense. In an affidavit submitted with that motion, Dr. Loewenstein stated that, based on his March 3, 2002 and March 17, 2002 interviews and testing of Orndorff, his review of "the case materials," collateral interviews he performed, and his "education, training, knowledge, and experience," it

was his opinion within a reasonable degree of medical and psychiatric certainty that Orndorff

met the "diagnostic criteria" for dissociative identity disorder, among other less severe

psychiatric disorders. Dr. Loewenstein further stated in the affidavit as follows:

> Dissociative Identity Disorder (DID): She manifests "two or more distinct identities or personality states (each with its own relatively enduring pattern of perceiving, relating to, and thinking about the environment and self)" (DSM-IV). In fact, I have encountered 7 distinct alter identities in Ms. Orndorff, including the "Janice" identity that is nominally the "host" alter. In addition, "at least two of these identities or personality states recurrently take control of the person's behavior" (DSM-IV). I have seen switching, that is, a transition of "executive control" of the human being, by multiple alters during the clinical interviews and testing. Finally, Ms. Orndorff describes and manifests dissociative amnesia, "inability to recall important personal information that is too extensive to be explained by ordinary forgetfulness." (DSM-IV). She described amnesia for a variety of life experiences and times in her past, including segments of her legal hearing, as well as demonstrating amnesia during clinical interviews.

> \*       \*       \*       \*       \*       \*       \*

> 2. Janice Orndorff's Mental State at the Time of the Crime: Based on my review of materials and interviews with Ms. Orndorff, it is my opinion that, at the time of the murder of Goering G. Orndorff, Ms. Orndorff suffered from an impulse that was sudden, spontaneous, and unpremeditated. At the time of the crime, Ms. Orndorff was overwhelmed by symptoms of dissociative identity disorder and personality disorder NOS, and, possibly, by acute and/or chronic posttraumatic stress disorder and depression NOS as well. Accordingly, she was so impaired by these diseases of the mind that she was totally deprived of the mental power to control or restrain her acting to harm Goering Orndorff. Therefore, her mental state at the time of the act should lead to a finding of legal insanity by Virginia law under the "irresistible impulse" test of the insanity statutes.

At the hearing on Orndorff's motion for a new trial based on after-discovered evidence,

the trial judge accepted Dr. Loewenstein's affidavit as a proffer of evidence. After argument by

counsel, the trial judge denied Orndorff's motion for a new trial. In reaching that decision, the

trial judge found that, while Orndorff showed that the purported after-discovered evidence was

- 22 -

not merely cumulative, corroborative or collateral, she failed to show that she could not have obtained that evidence, which was in her control, for use at the trial through due diligence. The trial judge also found that Orndorff failed to show that the purported after-discovered evidence should produce the opposite result in another trial, stating as follows:

> In part, I conclude that [such evidence] would not produce opposite results on the merits at another trial because the jury did, in fact, hear all this. They heard . . .[,] in essence, her entire position, that she had [dissociative identity disorder], that there were multiple personalities, in fact, . . . another personality is the one that committed the murder . . . .

Despite expressing "some doubt" about the timing of the behavior that led to the dissociative identity disorder diagnosis, the trial judge further implicitly found that Orndorff showed that the evidence in question appeared to have been discovered after the guilt phase of the trial. "It was not until she actually had been convicted by the jury," the trial judge stated, "that apparently she acted in such a manner that [dissociative identity disorder] was even possibly considered." Thereafter, the judge continued, "apparently her symptoms became more severe and the diagnosis of [dissociative identity disorder] was made and the alters started coming out."

The trial judge subsequently entered an order sentencing Orndorff, consistent with the jury's verdict, to thirty-two years' imprisonment for the murder of her husband and three years' imprisonment for using a firearm in the commission of that murder, for a total sentence of thirty-five years.

This appeal followed.

## II. ANALYSIS

On appeal, Orndorff contends the trial court abused its discretion in denying her motion for a new trial based on after-discovered evidence that she suffered from dissociative identity disorder and that, as a result of that disorder, her mind was so impaired at the time of the shooting that she was totally deprived of the mental power to control or restrain her act.

Specifically, she contends the trial court erred in concluding that she could have secured that evidence through the exercise of reasonable diligence for use at trial and that the admission of that evidence at another trial would not produce an opposite result because the jury heard and rejected that evidence at the sentencing phase of her trial. In response, the Commonwealth contends the trial court correctly determined that Orndorff failed to show that the purported after-discovered evidence was reasonably unobtainable for use at the original trial and would be material and produce an opposite result upon retrial. We agree with Orndorff.

Our Supreme Court has consistently held that

> [m]otions for new trials based on after-discovered evidence are addressed to the sound discretion of the trial judge, are not looked upon with favor, are considered with special care and caution, and are awarded with great reluctance. The applicant bears the burden to establish that the evidence (1) appears to have been discovered subsequent to the trial; (2) could not have been secured for use at the trial in the exercise of reasonable diligence by the movant; (3) is not merely cumulative, corroborative or collateral; and (4) is material, and such as should produce opposite results on the merits at another trial.

Odum v. Commonwealth, 225 Va. 123, 130, 301 S.E.2d 145, 149 (1983) (citation omitted); see Commonwealth v. Tweed, 264 Va. 524, 528-29, 570 S.E.2d 797, 800 (2002). "The burden is on the moving party to show that all four of these requirements have been met in order to justify a new trial." Johnson v. Commonwealth, 41 Va. App. 37, 43, 581 S.E.2d 880, 883 (2003).

Here, the trial judge specifically found that the evidence that Orndorff suffered from dissociative identity disorder at the time of the murder was not cumulative, corroborative, or collateral. The judge also implicitly found that the evidence came to light after the guilt-phase verdict when Orndorff's "alters started coming out" and "the diagnosis of [dissociative identity disorder] was made." The Commonwealth argues on appeal, as the trial judge found, that the second and fourth requirements were not met. Thus, in determining whether the trial court abused its discretion in denying Orndorff's motion for a new trial based on after-discovered

evidence, we will limit our consideration to the question of whether Orndorff satisfied her burden of showing that the second and fourth requirements were met.

Because the granting of a motion for a new trial based on after-discovered evidence is addressed to the sound discretion of the trial court, the court's "decision will not be reversed except for an abuse of discretion." Carter v. Commonwealth, 10 Va. App. 507, 514, 393 S.E.2d 639, 643 (1990). A trial court may be found to have abused its discretion if the court uses "an improper legal standard in exercising its discretionary function," Thomas v. Commonwealth, 263 Va. 216, 233, 559 S.E.2d 652, 661 (2002), or "makes factual findings that are plainly wrong or without evidence to support them," Congdon v. Congdon, 40 Va. App. 255, 262, 578 S.E.2d 833, 836 (2003).

A. Discoverability of the After-Discovered Evidence

It is well established in Virginia that a new trial will not be granted on the basis of after-discovered evidence "unless such evidence could not have been discovered by the exercise of reasonable diligence in time for use at the former trial[]." McClung v. Folks, 126 Va. 259, 266, 101 S.E. 345, 347 (1919). Thus, "it must appear . . . that the evidence . . . is such, that by the exercise of reasonable diligence on the part of the applicant it could not have been procured for the trial." Id. at 267, 101 S.E. at 347. It is not enough, however, "merely to say that the evidence could not have been discovered by the use of due diligence." Fulcher v. Whitlow, 208 Va. 34, 38, 155 S.E.2d 362, 365 (1967). The party seeking a new trial on the ground of after-discovered evidence must submit evidence showing "that [s]he used reasonable diligence to secure [the after-discovered] evidence before the earlier trial" and "explaining why [s]he was prevented from securing it." Id. "Reasonable diligence always depends upon the facts and circumstances of the case." McClung, 126 Va. at 266, 101 S.E. at 347.

Here, the trial court determined that Orndorff failed to show that the evidence she suffered from dissociative identity disorder at the time of the murder could not have been discovered for use at trial through the exercise of reasonable diligence. The record, however, does not support that determination. Indeed, the record reveals that Orndorff did everything that was reasonably possible prior to trial to discover grounds for a plea of not guilty by reason of insanity and that, despite those efforts, evidence supporting a diagnosis of dissociative identity disorder did not present itself to defense counsel or the psychiatrists and psychologists involved in Orndorff's treatment and evaluation until after the guilt phase of Orndorff's trial had ended.

The undisputed evidence establishes that, well before trial, Orndorff's counsel retained Dr. Fiester, a forensic psychiatrist and authority on personality disorders, and Dr. van Gorp, a clinical psychologist and neuropsychologist and an authority on malingering, to examine and evaluate Orndorff to determine if she had any psychiatric or psychological disorders that were relevant to her defense. Both doctors examined Orndorff and the materials related to the case, including the tape of Orndorff's 911 call. While both doctors diagnosed Orndorff as having a propensity to dissociate and opined that the amnesia she experienced regarding her husband's murder was the result of a dissociative episode caused by the trauma of her husband's death, neither doctor found any evidence that would support a diagnosis of dissociative identity disorder or of any other mental illness that would permit the reasonable assertion of an insanity defense. Thus, Orndorff was precluded from asserting an insanity defense at trial.

The Commonwealth argues that, because there "was substantial evidence of dissociation available before trial," the exercise of reasonable diligence required that Orndorff examine the possibility of dissociative identity disorder at that point. In making that argument, however, the Commonwealth fails to heed the manifest distinction between mere dissociation and dissociative identity disorder. As Dr. Fiester testified, "dissociation," by itself, "simply means the person

- 26 -

doesn't recall" because "[t]here's a disconnect between the emotions and actions and the conscious awareness of [those emotions and actions.]" This was the diagnosis the doctors made before the trial. Dissociative identity disorder, on the other hand, is, according to Dr. Fiester, a distinctive, severe dissociative disorder that involves "the emergence of another part of the personality that seems like almost a different person."

As the evidence further establishes, it was not until Orndorff entered into a childlike state after the jury rendered its verdict that Drs. Fiester and van Gorp encountered evidence that indicated she might be suffering from dissociative identity disorder. Soon after observing Orndorff in that state, Dr. Fiester testified that Orndorff's condition raised the possibility that Orndorff could have dissociative identity disorder. Upon learning of the incident, Dr. van Gorp immediately wrote that "a multiple personality disorder must be seriously considered and psychologically and psychiatrically ruled out." Explaining why he had not considered the possibility of Orndorff having dissociative identity disorder before then, Dr. van Gorp testified that a diagnosis of dissociative identity disorder "can only be made when [the patient's] various alters, or separate personalities, emerge." Similarly, Dr. Fiester testified that dissociative identity disorder cannot be diagnosed "without the presence of a separate identity." Hence, Dr. Fiester explained, she did not have "enough information to . . . make the diagnosis" of dissociative identity disorder until Orndorff presented "as a twelve-year-old girl" after her conviction. Thus, the record contains uncontradicted explanations as to why the doctors earlier had not considered the possibility of Orndorff having dissociative identity disorder.[1]

---

[1] We need not analyze the differences, if any, between Wisconsin or Oklahoma law and Virginia law on this point. We merely note that the two Wisconsin cases cited by the dissent, Williams v. State, 631 N.W.2d 623 (Wis. Ct. App. 2001), and State v. Fosnow, 624 N.W.2d 883 (Wis. Ct. App. 2000), are factually dissimilar from this case and that the Oklahoma case cited by the dissent, Sellers v. State, 889 P.2d 895 (Okla. Crim. App. 1995), is likewise inapposite. In Williams, the purported newly discovered evidence was "simply [the psychologist's] assessment of pre-existing information, the same information [previously reported and] utilized by [the

Moreover, the evidence indicates that dissociative identity disorder is not easily diagnosed. Dr. Dell, who consulted with the staff at Central State Hospital during Orndorff's treatment, testified that diagnosing dissociative identity disorder is difficult because the various alter personalities are "cautious, distrusting and hidden" and are not easily discernible, particularly to the untrained or inexperienced eye.[2]

physician who originally examined the petitioner]." 631 N.W.2d at 627. In Fosnow, where the defendant had a lengthy history of mental illness and it was known prior to his guilty plea that he heard "voices," had significant "memory lapses," suffered from "traumatic" childhood abuse, and had "imaginary friends" who made him "do bad things," the court ruled that "Fosnow and his trial counsel were aware of a possible [dissociative identity disorder] diagnosis from [one of the examining psychiatrist's] report and did not choose to obtain additional evaluations that might have supported it [prior to entry of the guilty plea]." 624 N.W.2d at 889-91. In each case, unlike in Orndorff's case, the purported newly discovered evidence was "previously known but not used." Id. at 886. In other words, it was merely a reassessment of the same evidence that had been discovered earlier, which is not the case here. In Sellers, the appellant claimed in his application for post-conviction relief based on newly discovered evidence solely that his multiple personality disorder could not have been discovered prior to trial because the disorder was "greatly misunderstood and often misdiagnosed." 889 P.2d at 897. Summarily rejecting Sellers's claim without setting forth or addressing any evidence relative thereto, the court simply ruled that, while "perhaps a relatively new mental disease," multiple personality disorder was a "recognized illness which defense counsel could have investigated." Id. The newness of dissociative identity disorder is not at issue here.

[2] We note that, in relying on (1) a mere explanatory allusion by Dr. Fiester to "multiple personality disorder" in a wide-ranging discussion of the "variety of conditions" that can "trigger amnesia" generally and (2) Dr. Dell's statement that he was able to discern evidence of Orndorff's alter personalities from the transcript of Orndorff's 911 call as grounds for concluding that Drs. Fiester and van Gorp should have been able, prior to trial, to diagnose Orndorff as suffering from dissociative identity disorder, the dissent appears to inappropriately place the responsibility for exercising reasonable diligence under Odum's second requirement on Drs. Fiester and van Gorp, rather than on Orndorff and her trial counsel. See Odum, 225 Va. at 130, 301 S.E.2d at 149 ("The applicant bears the burden to establish that the [after-discovered] evidence . . . (2) could not have been secured for use at the trial in the exercise of reasonable diligence by the *movant* . . . ." (Emphasis added.)). It is uncontroverted that Drs. Fiester and van Gorp were both accomplished mental health professionals and that Dr. Fiester was an eminent authority on personality disorders. Indeed, Dr. Fiester was a member of the "work group" that prepared the DSM-IV "in the area of personality disorders specifically." Moreover, unlike Drs. Fiester and van Gorp when they performed their pretrial evaluations of Orndorff, Dr. Dell had the benefit of examining Orndorff and the transcript of Orndorff's 911 call after, and with the knowledge of, the post-conviction emergence of Orndorff's alter personalities.

- 28 -

The evidence also shows that Orndorff did not have control over the timing of the emergence of her symptoms of dissociative identity disorder. Both Drs. Fiester and Loewenstein testified that people with dissociative identity disorder cannot control the switching that occurs between their alter personalities. Moreover, no psychologist or psychiatrist involved in Orndorff's treatment or evaluation found that she was malingering or otherwise had control over the emergence of her symptoms. In fact, Dr. van Gorp, an expert in the detection of malingering, testified that, based on the normal slow evolution of the presentation of Orndorff's symptoms and the results of specialized tests he gave her that were designed to detect malingering, he was "convinced" Orndorff was not feigning her psychiatric symptoms of dissociative identity disorder.

Because the record conclusively demonstrates that Orndorff used reasonable diligence prior to trial in seeking evidence that could reasonably serve as a basis for an insanity plea and explains why, despite that reasonable diligence, she was prevented from securing such evidence until after her conviction, we hold that the trial court abused its discretion in finding Orndorff failed to meet her burden of establishing that the evidence that she suffered from dissociative identity disorder "could not have been secured for use at the trial in the exercise of reasonable diligence by [her]." Odum, 225 Va. at 130, 301 S.E.2d at 149.

### B. Materiality and Effect at Another Trial of the After-Discovered Evidence

Pursuant to the fourth requirement for obtaining a new trial based on after-discovered evidence, the defendant must establish that such evidence "is material, and such as *should* produce opposite results on the merits at another trial." Id. (emphasis added). This "well-settled" standard has also been stated to require that the evidence be such that it "'*ought* to produce opposite results on the merits'" at another trial. Lewis v. Commonwealth, 209 Va. 602, 608-09, 166 S.E.2d 248, 253 (1969) (emphasis added) (quoting Reiber v. Duncan, 206 Va. 657,

663, 145 S.E.2d 157, 162 (1965)).  It is not enough, therefore, for the defendant to simply show

that the evidence in question might produce an acquittal.  Indeed, "[b]efore setting aside a

verdict, the trial court must have evidence before it to show in a clear and convincing manner 'as

to leave no room for doubt' that the after-discovered evidence, if true[,] would produce a

different result at another trial."  Carter, 10 Va. App. at 513, 393 S.E.2d at 642 (quoting Powell

v. Commonwealth, 133 Va. 741, 756, 112 S.E. 657, 661 (1922)).[3]

Here, the trial judge, observing that the jury recommended a heavy sentence for Orndorff,

concluded that the purported after-discovered evidence "would not produce opposite results on

the merits at another trial" because the jury heard at the penalty phase the after-discovered

---

[3] We cite to Carter because it is a prior opinion from this Court concerning
after-discovered evidence.  We note, however, that the efficacy of this quotation may be
problematic when the issue does not involve perjury.  This quotation in Carter is based upon the
following language in Powell, which concerned new evidence being offered to establish perjury:

> The courts properly require that it shall be made to appear
> affirmatively that the new evidence tending to show the mistake or
> *the perjury*, beyond question exists and is not a mere matter of
> belief or opinion, before they will grant the relief in such cases.
> *Where the ground is perjury*, the old rule was that the witness must
> appear of record to have been convicted of the perjury or his death
> must have rendered conviction impossible, before it could be
> regarded as good ground for the new trial.  The modern rule is not
> so strict.  By the preponderance of authority it seems to be
> sufficient if the court has evidence before it which *establishes the*
> *existence of the evidence relied on to show the perjury or mistake,*
> *in such a clear and convincing manner as to leave no room for*
> *doubt as to the existence of the evidence so relied on*, and the court
> is satisfied that the evidence is not collusive, that it seems to be
> true, and ought, if true, to produce on another trial an opposite
> result on the merits.

133 Va. at 755-56, 112 S.E. at 661 (emphases added).  In short, the Powell opinion concerns
evidence to "show . . . perjury," and it uses the "clear and convincing" standard to refer "to the
*existence* of the evidence" that is offered to support the request for a new trial.  Id. at 756, 112
S.E. at 661 (emphasis added).

evidence, including that Orndorff "had [dissociative identity disorder], that there were multiple personalities, [and that] . . . another personality is the one that committed the murder."

Initially, we hold the trial court abused its discretion in relying on the jury's apparent rejection of Orndorff's mitigating evidence at sentencing as grounds for concluding that such evidence would not produce a different result at the guilt phase. The correct standard is not whether the jury that convicted the defendant without benefit of the after-discovered evidence would, after hearing the new evidence, recommend a lenient sentence, but, rather, whether the new evidence "is material, and such as should produce opposite results on the merits *at another trial*," with a new jury. Odum, 225 Va. at 130, 301 S.E.2d at 149 (emphasis added).

The circumstances of this case exemplify the underlying rationale and merits of that distinction. Before sentencing, the jury heard no evidence regarding Orndorff's psychological state at the time of the killing. Because the evidence that later supported a diagnosis of dissociative identity disorder had not been discovered, Orndorff's experts were limited during the guilt phase of the trial to providing a general discussion of the nature of dissociative amnesia as a possible explanation of Orndorff's unusual post-killing behavior. Rejecting that explanation and Orndorff's claim of self-defense in favor of the Commonwealth's argument that Orndorff's unusual post-killing behavior was an attempt to cover up a malicious killing, the jury convicted her of murder. It is of no surprise, then, that, having found Orndorff to be a murderer and a liar, the jury apparently found her belated mitigating evidence of insanity unpersuasive. Clearly, the jury's sentencing verdict is not a reliable indicator of how a new, untarnished fact finder would view such evidence "at another trial" where insanity was at issue in the guilt phase. Id.

Evidence reasonably offered to support a defendant's claim that he or she was legally insane at the time of the alleged offense has long been recognized in Virginia as being material to the issue of the defendant's guilt. See Boswell v. Commonwealth, 61 Va. (20 Gratt.) 860,

874-76 (1871) ("If [the defendant] relies on the defence of insanity, he must prove it to the satisfaction of the jury. If, upon the whole evidence, they believed he was insane when he committed the act, they will acquit him on that ground."); Evans-Smith v. Commonwealth, 5 Va. App. 188, 196, 361 S.E.2d 436, 441 (1987) ("Evidence is material if it relates to a matter properly at issue.").

> Virginia law recognizes two tests by which an accused can establish criminal insanity, the M'Naghten Rule and the irresistible impulse doctrine. The irresistible impulse defense is available when "the accused's mind has become 'so impaired by disease that he is totally deprived of the mental power to control or restrain his act.'"

Bennett v. Commonwealth, 29 Va. App. 261, 277, 511 S.E.2d 439, 446-47 (1999) (quoting Godley v. Commonwealth, 2 Va. App. 249, 251, 343 S.E.2d 368, 370 (1986) (quoting Thompson v. Commonwealth, 193 Va. 704, 716, 70 S.E.2d 284, 292 (1952))).

As the Commonwealth notes in its appellate brief, the after-discovered evidence in this case consists of substantive information, in the form of expert-witness testimony and proffered evidence, indicating that Orndorff suffered from dissociative identity disorder at the time of the shooting and that one or more of her alter personalities, other than the host or baseline personality of Janice Orndorff, was responsible for committing the charged offenses. The after-discovered evidence also indicates that Orndorff was not malingering in her presentation of dissociative identity disorder symptoms, that she was unable to control the switching between the alter personalities within her, that her alter personalities recurrently took control of her behavior, and that her host personality of Janice had no memory of her husband's murder. Dr. Loewenstein testified that one of Orndorff's protector alter personalities admitted to killing Orndorff's husband to protect the host personality. Dr. Loewenstein stated in his affidavit that, upon his forensic evaluation of Orndorff, he concluded that, at the time of the killing, Orndorff "suffered from an impulse that was sudden, spontaneous, and unpremeditated." Dr. Loewenstein

- 32 -

further concluded that Orndorff was so "overwhelmed" by symptoms of dissociative identity disorder and other less severe mental disorders and "so impaired by these diseases of the mind[,] that she was deprived of the mental power to control or restrain her acting to harm [her husband]." Dr. Loewenstein also concluded that Orndorff was suffering from an irresistible impulse when she shot her husband and was, thus, legally insane at the time of the killing.

Although it is within the province of the fact finder to decide whether Orndorff's mind was """"so impaired by disease that [she was] totally deprived of the mental power to control or restrain"""" herself from acting at the time of the offenses, if true, Dr. Loewenstein's testimony and affidavit, in combination with the other after-discovered evidence presented in this case, present a viable defense of legal insanity under the doctrine of irresistible impulse. Bennett, 29 Va. App. at 277, 511 S.E.2d at 447 (quoting Godley, 2 Va. App. at 251, 343 S.E.2d at 370 (quoting Thompson, 193 Va. at 716, 70 S.E.2d at 292)). We conclude, therefore, that the after-discovered evidence is material to the issue of Orndorff's guilt and is sufficient to "show in a clear and convincing manner 'as to leave no room for doubt' that the after-discovered evidence, if true[,] would produce a different result at another trial." Carter, 10 Va. App. at 513, 393 S.E.2d at 642 (quoting Powell, 133 Va. at 756, 112 S.E. at 661).

The Commonwealth argues that, as a matter of law, the after-discovered evidence does not provide a valid defense of legal insanity under the irresistible impulse doctrine because "the evidence overwhelmingly established that subsequent to the alleged irresistible impulse the defendant doctored the scene of the crime . . . and called her attorney for assistance." We disagree.

While it is true, generally, that, as logic dictates, "the lack of restraint inherent in an impulsive act is inconsistent with a contemporaneous concealment of the impulsive act," Vann v. Commonwealth, 35 Va. App. 304, 314, 544 S.E.2d 879, 883 (2001), here, given the volatile,

"switching" nature of Orndorff's mental disorder, the fact that Orndorff called her attorney and "doctored the scene of the crime" after the shooting does not mean that she was not acting pursuant to an irresistible impulse when she shot her husband. As previously noted, people with dissociative identity disorder cannot restrain their alter personalities from recurrently taking and relinquishing control of their behavior. The shifts between and among the alter personalities can occur very quickly. Furthermore, as Dr. Loewenstein testified, the switching by the alter personalities tends to increase when the host personality is frightened.

Thus, the record supports the finding that, as the Commonwealth appears to concede, the phone call to Orndorff's attorney and any manipulation of the crime scene by Orndorff occurred "subsequent to the . . . irresistible impulse" that resulted in the killing. That is to say, after killing Orndorff's husband, Orndorff's alter personalities relinquished control of her behavior, leaving her "behind to attempt to deal with what happened." The post-shooting phone call and any manipulation of the scene do not change the fact that, having had her behavior taken over by one or more of her protector alter personalities at the time of the shooting, Orndorff herself was not responsible for shooting her husband. Hence, as a matter of logic, <u>Vann</u> would not apply.

The record also supports the converse finding that, as Drs. Loewenstein's and Dell's testimony appears to suggest, Orndorff's alter personalities continued to control her behavior following the shooting. According to Dr. Loewenstein, one of Orndorff's protector alter personalities stated that he directed Orndorff to call her attorney after the shooting. Dr. Dell testified that Orndorff was still being controlled by her alter personalities well after the shooting during the 911 call. Clearly, Orndorff may not be held accountable under <u>Vann</u> for the phone call to her attorney and for doctoring the crime scene if, as during the shooting, her actions were still being controlled by her alter personalities at the time. Like the shooting itself, such actions would be the product of an irresistible impulse.

- 34 -

Thus, under either interpretation of the facts, the evidence of Orndorff's post-shooting phone call to her attorney and doctoring of the crime scene does not alter our conclusion that the after-discovered evidence provides Orndorff a valid defense of legal insanity under the irresistible impulse doctrine. To conclude otherwise would defy logic and elevate form over substance.

We hold, therefore, that Orndorff met her burden of establishing that the after-discovered evidence "is material, and such as should produce opposite results on the merits at another trial." Odum, 225 Va. at 130, 301 S.E.2d at 149.

### III. CONCLUSION

Having found that Orndorff met the requirements necessary to obtain a new trial based on after-discovered evidence, we hold the trial court abused its discretion in refusing to grant Orndorff a new trial. Accordingly, we reverse the trial court's denial of the motion for a new trial, vacate Orndorff's convictions for murder in the second degree and use of a firearm in the commission of murder, and remand this case for retrial, if the Commonwealth be so advised.

Reversed and remanded.

Fitzpatrick, C.J., dissenting.

I respectfully dissent and would affirm appellant's convictions. I would hold that the evidence in this case failed to meet the requisite standard to order a new trial based on after-discovered evidence.

There is no dispute as to the applicable law.

> "[M]otions for new trials based on after-discovered evidence are addressed to the sound discretion of the trial judge, are not looked upon with favor, are considered with special care and caution, and are awarded with great reluctance." A party who seeks a new trial based upon after-discovered evidence "bears the burden to establish that the evidence (1) appears to have been discovered subsequent to the trial; (2) could not have been secured for use at the trial in the exercise of reasonable due diligence by the movant; (3) is not merely cumulative, corroborative or collateral; and (4) is material, and such as should produce opposite results on the merits at another trial."

Commonwealth v. Tweed, 264 Va. 524, 528-29, 570 S.E.2d 797, 800 (2002) (quoting Stockton v. Commonwealth, 227 Va. 124, 149, 314 S.E.2d 371, 387 (1984); Odum v. Commonwealth, 225 Va. 123, 130, 301 S.E.2d 145, 149 (1983)). I agree with the trial court that appellant failed to establish both the second and fourth prongs of this test.

## I. Due Diligence

The majority holds that the record in this case does not support the trial court's finding that evidence of appellant's Dissociative Identity Disorder (DID) was discernible and available at the time of trial through the exercise of reasonable diligence. I disagree. The record is replete with examples of, and information about, appellant's dissociative conduct and the possibility of the purported correct diagnosis of DID. While appellant was unable to obtain an expert who diagnosed the specific type of dissociative disorder until later in the case, this does not mean that the evidence was unavailable at the time of trial. In effect, appellant asks us to allow a different

post-trial diagnosis of a possible mental illness to require a new trial. This is a continuum that the law does not encourage.

While we have not addressed this specific issue, two of our sister states have provided guidance. In State v. Fosnow, 624 N.W.2d 883 (Wisc. Ct. App. 2000), after the defendant's conviction on several felonies, a prison psychiatrist diagnosed him with DID. After the diagnosis, he filed a motion to withdraw his pleas of no contest because the new diagnosis would show he was not criminally responsible for his acts. He argued that the new diagnosis constituted newly discovered evidence that entitled him to withdraw his earlier no contest plea. The Court of Appeals of Wisconsin, in affirming the trial court, held that the new diagnosis was merely the new appreciation of the importance of existing evidence. As in the instant case, extensive psychiatric information about Fosnow was available at the time of the plea and indicated dissociative personality features and other possible DID symptoms. The main factors underlying the new diagnosis existed and were available at the time of defendant's initial mental examinations. "Newly discovered evidence, however, does not include the new appreciation of the importance of evidence previously known but not used." Id. at 886 (internal citations omitted). See also State v. Williams, 631 N.W.2d 623, 627 (Wisc. Ct. App. 2001) (an expert's assessment of pre-existing information represents a "new appreciation of the importance of evidence previously known but not used," not newly discovered evidence).

In Sellers v. State, 889 P.2d 895 (Okla. Crim. App. 1995), the appellant was convicted of three counts of murder. In an application for post-conviction relief, appellant alleged that he was diagnosed after conviction with Multiple Personality Disorder (MPD) and that this newly discovered evidence required a new trial. The court held that "[t]hough at that time MPD was perhaps a relatively new mental disease," this fact does not provide a sufficient explanation for its failure to be addressed earlier because it was a recognized diagnosis at the time of trial. Id. at

- 37 -

897. "Trial counsel could have, with due diligence, discovered evidence of [appellant's] . . . MPD prior to trial. Accordingly it was not 'newly discovered' and would not warrant a new trial." Id. Fosnow and Sellers are factually analogous to the instant case, and I would adopt their reasoning.

At a pretrial hearing, appellant presented two mental health experts who gave detailed opinions concerning her mental health at the time of the shooting and thereafter.[4] Dr. Feister testified that in September 2000, she personally met with appellant for over sixteen hours and spoke to her on additional occasions by phone. She had reviewed appellant's psychological testing results, the 911 call and transcript, transcripts of earlier interviews with the police and other police reports. In response to counsel's questions, she opined that appellant suffered from "Major Depression Disorder, Recurrent, Post Traumatic Stress Disorder," and discussed several of appellant's dissociative events including her involvement in an earlier automobile accident and the description of her conduct during the 911 call to police. Dr. Fiester stated that "[appellant] was in a dissociative episode for a period of time subsequent to her husband's death." In discussing the relationship of appellant's "amnesia" resulting from the traumatic event of the murder, Dr. Fiester specifically noted that "[o]ne can experience amnesia as a part of a dissociative disorder, sometimes referred to as *multiple personality disorder*." (Emphasis added.) The information on her psychological makeup was clearly available and capable of

---

[4] At the pretrial hearings on appellant's mental state, two mental health experts were retained by appellant, Dr. Susan J. Fiester, a forensic psychiatrist, and Dr. Wilfred G. van Gorp, a clinical psychologist and neuropsychologist. Neither could state that appellant met the test for insanity based on their extensive evaluations. At the sentencing stage the following additional mental health experts testified, Dr. Greg Wolber, Chief of the Forensic Team at Central State Hospital where appellant was sent for post-trial evaluation, Dr. Paul Frederick Dell, the clinical psychologist who diagnosed appellant as suffering from DID, Dr. Richard Joseph Loewenstein, a defense retained psychiatrist, and Dr. Daniel Sheneman, the attending psychiatrist for appellant at Central State who testified for the Commonwealth in rebuttal.

being analyzed in determining any potential diagnosis. In fact, this was the later diagnosis that appellant now asserts is newly discovered.

Additionally, the fact that after the jury's finding of guilt, appellant's symptoms became more pronounced and easier to categorize does not require a different result. All of the experts opined that DID is an illness that develops over a long period of time and has its etiology in childhood. Dr. Dell, in describing the failure of the other experts to properly diagnose appellant's true condition earlier, listed a "profound lack of education and inability to recognize diagnostic signs" as the basis for any possible earlier misdiagnosis. He testified that it was clear from the transcript of the 911 call that appellant's "alters" were present at that time. Even assuming that appellant's acute episodes after the guilty verdict made a diagnosis of DID easier, this later diagnosis was really just a different diagnosis of a known condition. To hold otherwise would leave the door open for a new trial with each new diagnosis and, thus, dispense with the finality that a trial on the merits requires. I would hold that this evidence was available in the exercise of due diligence at trial. Accordingly, the new diagnosis does not warrant a new trial.

## II. Materiality

I also would hold that appellant failed to establish that the "new" DID diagnosis was "such as should produce opposite results on the merits at a new trial." Odum, 225 Va. at 130, 301 S.E.2d at 149. The standard for a new trial based on after-discovered evidence also includes the admonition that "[b]efore setting aside a verdict, the trial court must have evidence before it to show in a clear and convincing manner 'as to leave no room for doubt' that the after-discovered evidence, if true[,] would produce a different result at another trial." Carter v. Commonwealth, 10 Va. App. 507, 513, 393 S.E.2d 639, 642 (1990).

The unique procedural posture of this case clearly shows that appellant failed to meet this criteria. Initially it is important to note, that the "after discovered" evidence, which is actually a

new diagnosis of earlier behavior indicators, was presented to the jury during the sentencing phase of the trial, yet they found it unconvincing even as possible mitigation of punishment. When defense counsel filed a motion requesting a new trial based on appellant's new diagnosis, he asked the trial court to defer ruling on the motion until after the jury could consider the information and recommended a sentence. Thus, the jury actually heard all the newly discovered evidence. The evidence, as outlined in the majority opinion, was extensive. Several psychologists and psychiatrists described in great detail the nature of DID, appellant's background, why her diagnosis was not made earlier, that one of her "alters" was responsible for the murder of her husband and even opined that she was not a malingerer. Simply put, the jury discounted the new diagnosis of DID and sentenced her to far in excess of the minimum sentence for the offense. This resolves the question of whether this additional evidence would produce a different result at a retrial.

It is true, as noted by the majority, that a part of the "materiality" prong of the after-discovered evidence test is that the new evidence would produce a different verdict "at another trial." They contend that because the jury heard the new evidence as a part of the same proceeding, it does not meet the "other trial" requirement. The procedural course of this case as dictated by the appellant's request to allow the evidence in the same trial precludes this argument. She requested it and should not now be heard to challenge it. Additionally this requirement assumes that the newly discovered evidence is, in fact, discovered after trial and is unavailable for the fact finder to consider. I agree with the trial judge who succinctly stated that appellant failed to prove that the new evidence would produce a different verdict at another trial because the jury heard all of the evidence underlying her claim and discounted it. A new trial presenting the same evidence to a new jury would not produce a different result. Thus, I would affirm her convictions.

III. Additional Questions

Appellant raises two additional questions on appeal that were not addressed by the majority as they did not consider them likely to arise on retrial. I would also affirm the trial court on these issues. First, she contends that the trial court erred in sentencing her because she was incompetent.

The party alleging incompetency has the burden to prove it by a preponderance of the evidence. See Code § 19.2-169(E). The trial court's competency finding is a question of fact and is reviewed under a plainly wrong standard. See Delp v. Commonwealth, 172 Va. 564, 570-71, 200 S.E. 594, 596 (1939). The evidence, properly viewed, established that appellant was competent to be sentenced.

Appellant was sent to Central State Hospital for a post-trial evaluation pursuant to Code §§ 19.2-169.1 and 19.2-176. Dr. Wolber and the Central State treatment team found her to be competent and opined that a "lot of her behavior was strictly manipulative and controlling . . . and did not give credence to a true dissociative identity." While appellant's experts put on evidence supporting a different conclusion, I cannot say that the evidence, when properly viewed, did not sustain the trial court's finding or was plainly wrong.

Appellant also contends the trial court erred by failing to allow her experts to testify that her mental illness was a basis for several inconsistencies in her behavior, including the 911 call made on the night of the murder.

"The admission of expert testimony is committed to the sound discretion of the trial judge, and we will reverse a trial court's decision only where that court has abused its discretion." Brown v. Corbin, 244 Va. 528, 531, 423 S.E.2d 176, 178 (1992). "It is well settled that an expert may not express an opinion as to the veracity of any witness." Davison v. Commonwealth, 18 Va. App. 496, 504, 445 S.E.2d 683, 688 (1994) (internal quotations

- 41 -

omitted). "An expert witness may not express an opinion as to the veracity of a witness because such testimony improperly invades the province of the jury to determine the reliability of the witness." Pritchett v. Commonwealth, 263 Va. 182, 187, 557 S.E.2d 205, 208 (2002).

The appellant proffered that her experts would offer an explanation other than "intentional fabrication" for several of her actions subsequent to her husband's death. In effect as the trial court found, appellant wished to put on expert testimony "that she [was] in a dissociative state and that she's suffering from amnesia and it is not because she's lying." The trial court allowed the experts to testify as to the general effect of trauma and that some lay observers might consider a dissociative act to be faking. However, he would not allow expert testimony commenting on the credibility of the appellant's statements. I find no error in that ruling.

Accordingly, I would affirm the convictions.